## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00950-COA

IN THE INTEREST OF J.K., A MINOR: MERLE                    APPELLANT
GLENN KIRKLEY

v.

JACKSON COUNTY DEPARTMENT OF CHILD                    APPELLEES
PROTECTION SERVICES AND J.L.M.K., A
MINOR, BY AND THROUGH HIS NEXT
FRIEND, LAQUITA REED

DATE OF JUDGMENT:              06/12/2018
TRIAL JUDGE:                   HON. SHARON WILLIS SIGALAS
COURT FROM WHICH APPEALED:     JACKSON COUNTY YOUTH COURT
ATTORNEYS FOR APPELLANT:       CHAD KENNETH KING
                               CAMERON MATTHEW McCORMICK
ATTORNEY FOR APPELLEES:        TONYA MICHELLE BLAIR
NATURE OF THE CASE:            CIVIL - CUSTODY
DISPOSITION:                   AFFIRMED - 10/13/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### EN BANC.

### BARNES, C.J., FOR THE COURT:

¶1.     Merle Kirkley appeals the termination of his parental rights, arguing that the Jackson County Youth Court (1) lacked jurisdiction over the adjudication of neglect and termination-of-parental-rights (TPR) proceedings and (2) erred in finding there was clear and convincing evidence to support the termination of Kirkley's parental rights. Finding no reversible error, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2. Kirkley and Cierra Cavanagh had a child, "John," who was born in November 2014.[1] On April 17, 2015, a social worker for the Jackson County Department of Child Protection Services (CPS) conducted a welfare check on the five-month-old child at a motel in Ocean Springs, Mississippi. Police found Xanax, marijuana, liquid steroids, three Oxymorphone pills, and a Suboxone strip in the room. Kirkley and Cavanagh were arrested for possession of a controlled substance (a misdemeanor), and John was taken into the custody of the Department of Human Services (DHS).

¶3. On April 21, 2015, the youth court judge appointed Denise Lee as the child's guardian ad litem (GAL). Kirkley was arrested again, on April 29, 2015, for possession of controlled substances in Harrison County. He entered Wings of Life for drug treatment on May 26, 2015, but left the facility one month later and entered another drug rehabilitation facility in Warren County in December 2015.

¶4. After three continuances, a youth court hearing was held on May 26, 2015. Kirkley, Cavanagh, the GAL, CPS/DHS representatives, and John's foster mother were in attendance at the hearing. The court ordered that custody of the child remain with the DHS, and an adjudication hearing was scheduled for June 10, 2015. The order also noted that "the permanent plan is reunification" and that the permanency hearing would be held on November 16, 2015. Kirkley was given a drug screen and tested positive for methamphetamine.

¶5. The following day, May 27, 2015, the Jackson County prosecuting attorney

---

[1] A pseudonym is being used to protect the child's identity.

electronically filed a petition with the youth court, alleging that John was a neglected child, and a summons was sent to Kirkley. On June 10, the youth court entered an order, stating that a first call/adjudication hearing had been held and that both parents had denied the allegations in the petition. The parents were granted supervised visitation with John.

¶6. An adjudication hearing was held on October 26, 2015, with Kirkley attending via telephone because he was incarcerated in Louisiana for a parole violation. Both Kirkley and Cavanagh withdrew their former denials and entered a plea of no contest; so the child was adjudicated as a neglected child on the counts contained in the petition. Kirkley and Cavanagh waived the waiting period for disposition, and the youth court proceeded with that hearing. *See* Miss. Code Ann. § 43-21-601 (Rev. 2015). The DHS outlined the tasks the parents needed to complete for reunification with John, including drug screens, parenting classes, and aftercare programs. Specifically with regard to Kirkley, the DHS stated that he would be required to complete an alcohol and drug treatment program. Kirkley agreed to these requirements.

¶7. On April 4, 2016, a Harrison County Circuit Court grand jury indicted Kirkley for two counts of possession of a controlled substance, stemming from his April 29, 2015 arrest. The youth court entered an order on April 19, 2016, stating that a permanency hearing was held with neither parent in attendance. The court also noted:

> Merle Kirkley failed to complete [alcohol and drug] treatment, and later was arrested on August 1, 2015. Since then Mr. Kirkley was ordered to drug court and he was participating in the love in action ministries in Laurel, MS. I spoke with the director of the program on April 18, 2016, and she indicated that "Merle is on the run." She indicated that he left the program.

The youth court adopted the permanency plan for "reunification with a parent or primary caretaker," as well as the concurrent plan for adoption, finding them in the child's best interest. The court further concluded, however, that the DHS had "documented compelling and extraordinary reasons why termination of parental rights would not be" in John's best interest at that time.

¶8. Kirkley was arrested in Louisiana and incarcerated at West Baton Rouge Parish Detention Center from April 23, 2016, to October 25, 2016. On July 11, 2016, a plan review hearing was held, wherein the youth court modified the permanent plan from reunification to TPR/adoption. Although neither parent attended the hearing, both parents were granted supervised visitation upon arrangement with the CPS.

¶9. A permanency review hearing was held on October 19, 2016. Kirkley attended via telephone. The youth court determined that the DHS had made reasonable efforts to effectuate a plan to meet the needs and best interest of the minor and accepted the recommended permanency plan of TPR/adoption. A permanency hearing was scheduled for April 17, 2017, and the youth court ordered Kirkley to keep his address and telephone number updated and to notify the court if he wished to participate in the permanency hearing via telephone.[2]

¶10. Kirkley entered a guilty plea to one count of possession of a controlled substance in the Harrison County Circuit Court on March 20, 2017, and he was sentenced to serve three

---

[2] The court's order noted Kirkley's address as "C/O Inmate #662020, West Baton Rouge Detention Center, D Dorm, Bed 8, P.O. Box 620, Port Allen, LA 70767."

years in the custody of the Mississippi Department of Corrections (MDOC).[3]  Kirkley was given a new family-service plan on March 23, 2017, requiring him to submit to random drug screens, "enroll and complete an after care program for a minimum of [twelve] months within five days of completion of inpatient treatment as approved by the [CPS], . . . [p]rovide a safe, stable, drug and violence free home for [John]," and maintain contact with the child and the CPS.  On May 8, 2017, the youth court entered an order continuing the hearing until May 17, 2017.  The court's order noted Kirkley's mailing address was "C/O MDOC #150090, CMCF, 3794 Hwy 468, Pearl, MS 39208."

¶11.    On March 27, 2017, the DHS filed a TPR petition with the youth court, which noted the couple's (1) habitual drug use, (2) failure to complete alcohol and drug treatment, (3) unwillingness to provide "reasonably necessary food, clothing, shelter, or medical care for the child," and (4) failure to "exercise reasonable visitation or communication with the child."  The petition asserted that termination of Cavanagh's and Kirkley's parental rights was "appropriate," as reunification between Cavanagh or Kirkley and John was not "desirable towards obtaining a satisfactory permanency outcome."

¶12.    On May 17, 2017, the youth court held the permanency hearing, with the GAL, CPS/DHS representatives, foster mother, and Kirkley present.  The DHS was unable to locate Cavanagh, and it was later discovered she was in Illinois with family but planned to enter a rehabilitation facility in California.  The court found that the DHS had made reasonable efforts towards the permanency plan of reunification previously adopted on April

---

[3] As part of a plea bargain, Count II was retired to the files.

5

19, 2016. The youth court set a TPR hearing for August 8, 2017, and appointed Kirkley an attorney to represent him at that hearing. A week later, on May 25, 2017, the youth court issued an amended order, which stated that the permanency plan for reunification was "no longer appropriate . . . and [that] the permanency plan of TPR/adoption [was] appropriate and in the best interest of [John.]" Cavanagh filed a motion for a continuance in August 2017, which the youth court granted, rescheduling the hearing for November 7, 2017.

¶13. The GAL, CPS/DHS representatives, foster parents, Kirkley, and Cavanagh were present at the November 7 hearing, along with Kirkley's appointed attorney. At the hearing, Kirkley acknowledged his prior criminal history, including a malicious mischief conviction in 2009 and a business burglary conviction in 2012. He also agreed that he had been incarcerated for a majority of time that John was in the DHS's custody and was unable to complete his service plan.

¶14. Gloria Sims, the DHS social worker assigned to the case, testified that Kirkley had been given two service plans, one in 2015 and one in 2017 after he had been incarcerated. The 2017 plan stated that Kirkley needed in-patient treatment and "to maintain visitations with child as approved by [CPS]." Because he was incarcerated, he was allowed to write letters to the child. Kirkley was also to obtain and maintain financial stability, have random drug screens, "[r]efrain from physical and verbal altercations," and enroll in aftercare upon release from prison. Sims testified that Kirkley had not completed the service plan. Sims also testified that Kirkley had seen John only six times since the child had been in DHS custody (over two years), specifically noting that Kirkley had not seen John since March

6

2016 due to his incarceration because the agency does not take children to visit inmates. Sims opined that there was a substantial erosion of the relationship between Kirkley and his son.

¶15. The TPR hearing was continued until January 25, 2018, and the permanency review hearing was continued until April 16, 2018. Sims again discussed the DHS's efforts to help Kirkley complete his service plan, but, as mentioned in the prior hearing, the agency was "very limited" in what it could do except to tell him to "participate in any and all services or programs that they have while they're incarcerated." A December 27, 2017 order from the Warren County Circuit Court was also entered into evidence, stating that Kirkley's prior suspended sentence for business burglary had been revoked. The circuit court sentenced Kirkley to seven years in the custody of the MDOC, "suspended upon completion of the Jackson County Restitution Center, and that upon completion of the Restitution Center, that the defendant be placed on post release supervision for a period of five (5) years." Kirkley was also ordered to pay $4,177.50 in unpaid fines, fees, and assessments. The January 25 hearing was continued until March 1-2, 2018. Both Kirkley and Cavanagh were present at the March 2018 TPR hearing, as well as Kirkley's attorney, the GAL, the foster parents, and various DHS representatives.

¶16. On April 16, 2018, after hearing all the testimony, reviewing the evidence, and considering the GAL's report and testimony from the November 7, 2017 hearing, the youth court issued its findings of fact and conclusions of law. The youth court determined that Kirkley "ha[d] been incarcerated for the majority of . . . [John's] life . . . [and] ha[d] a

7

history, by his own admission, of drug use and criminal activity." The court also noted that due to Kirkley's continual incarceration and the child's young age, Kirkley had "not been able to sustain a relationship with [John.]" Concluding that Kirkley's "pattern of criminal behavior and drug use [was] not likely to change in the future," the youth court found that termination of Kirkley's parental rights was in the child's best interest.[4] On June 12, 2018, the youth court entered its final judgment terminating Cavanagh's and Kirkley's parental rights, citing grounds for termination as set forth in Mississippi Code Annotated section 93-15-121(c)-(f) (Supp. 2017). Aggrieved, Kirkley appeals from the youth court's judgment.

## STANDARD OF REVIEW

¶17. This court's standard of review of a judgment terminating parental rights is limited to whether the trial court's decision was manifestly in error or clearly erroneous. *In re A.M.A.*, 986 So. 2d 999, 1009 (¶21) (Miss. Ct. App. 2007) (citing *G.Q.A. v. Harrison Cnty. Dep't of Human Servs.*, 771 So. 2d 331, 335 (¶14) (Miss. 2000)). "Under this standard, we will uphold [a youth court's] decision unless that decision is not supported by 'substantial, credible evidence, giving deference to the youth court's findings of fact.'" *Id*. (quoting *G.Q.A.*, 771 So. 2d at 335 (¶14)).

## DISCUSSION

I. **Whether the youth court had jurisdiction over the adjudication and TPR proceedings.**

¶18. Mississippi Code Annotated section 43-21-451 (Rev. 2015) provides in part:

---

[4] The court also terminated Cavanagh's parental rights, but because Cavanagh is not a party to this appeal, we will not address the court's findings with regard to the termination of her parental rights unless pertinent to the issues Kirkley has raised.

> All proceedings seeking an adjudication that a child is a delinquent child, a child in need of supervision, a neglected child or an abused child *shall be initiated by the filing of a petition*. Upon authorization of the youth court, the petition shall be drafted and *filed by the youth court prosecutor* unless the youth court has designated some other person to draft and file the petition.

(Emphasis added). Although Kirkley acknowledges that the prosecuting attorney submitted the petition with his digital signature through the Mississippi Youth Court Information Delivery System (MYCIDS) on May 27, 2015, he contends that the petition was not properly *filed* with the clerk's office. Thus, Kirkley claims that the youth court was without jurisdiction to adjudicate John as a neglected child and, likewise, to terminate Kirkley's parental rights. Kirkley further reasons that his service of summons was defective because "[w]ithout a *filed* petition, there is no petition." (Emphasis added). *See* Miss Code Ann. § 43-21-505(1) (Rev. 2015) (Unless otherwise provided, "service of the summons shall be made personally by delivery of a copy of the summons with a copy of the petition in a sealed envelope attached to the summons."). We find no merit to either claim. With his certified digital signature, the prosecuting attorney submitted the petition to the clerk's office, and the record indicates that the petition was filed on the youth court's general docket as Cause No. 30-YC-2015-P-277-1(284042) on May 27, 2015.[5]

¶19. Kirkley also argues that the summons failed to "inform him of his right to counsel or his right to a continuance for a reasonable time to consult with counsel." Mississippi Code Annotated section 43-21-503 (Rev. 2015) provides a template for the form of summons and contains the following language: "You have a right to be represented by an attorney. You

---

[5] On January 18, 2006, the Mississippi Supreme Court authorized the use of digital signatures on documents issued by the youth courts in the state using the MYCIDS system.

are requested to immediately notify the youth court of the name of your attorney." Section 43-21-503 provides that the form of the summons should "substantially" conform to the statute's language. *Id*. Rule 22 of the Uniform Rules of Youth Court Practice also states that "[t]he form of the summons shall be pursuant to section 43-21-503" and contains an additional notice to be placed at the bottom of the summons addressing various costs that a party may be required to pay. Kirkley's summons contained this required notice.

¶20. We find the summons issued to Kirkley, notifying him of the June 10, 2015 adjudication hearing, "substantially" complied with section 43-21-503 and Rule 22. While the summons did not specifically contain the phrase, "You have a right to be represented by an attorney," it did state the following in capital letters and bold type: "**IMPORTANT NOTICE: . . . MERLE KIRKLEY YOU MUST BE REPRESENTED BY AN ATTORNEY IN THIS CAUSE UNLESS THE RIGHT TO LEGAL REPRESENTATION IS WAIVED**." Moreover, the youth court judge appointed counsel to represent Kirkley in subsequent proceedings. Thus, unlike the cases cited in Judge McCarty's separate opinion, we find Kirkley was given notice of the adjudication proceedings and informed that representation by counsel was a right that could be waived. We have also found no requirement in the youth court practice rules or applicable statutes that the summons must contain language informing a party of a right to a continuance. Because Kirkley has not demonstrated that service of process was defective, or shown any prejudice as a result of any alleged defect, we find this issue is without merit.

II. **Whether the youth court erred in finding the termination of Kirkley's parental rights was supported by clear and convincing**

10

**evidence.**

¶21.　In its June 12, 2018 "Judgment Terminating Parental Rights," the youth court found

by clear and convincing evidence that it was in the best interest of John that Kirkley's and

Cavanagh's parental rights be terminated, citing section 93-15-121(c)-(f) of the Mississippi

Code,[6] which sets forth the grounds for involuntary termination of parental rights and

provides in pertinent part:

> Any of the following, if established by clear and convincing evidence, may be
> grounds for termination of the parent's parental rights if reunification between
> the parent and child is not desirable toward obtaining a satisfactory
> permanency outcome:
>
> . . . .
>
>> (c) The parent is suffering from habitual alcoholism or other
>> drug addiction and has failed to successfully complete alcohol
>> or drug treatment;
>>
>> (d) The parent is unwilling to provide reasonably necessary
>> food, clothing, shelter, or medical care for the child . . . ;
>>
>> (e) The parent has failed to exercise reasonable visitation or
>> communication with the child;
>>
>> (f) The parent's abusive or neglectful conduct has caused, at
>> least in part, an extreme and deep-seated antipathy by the child
>> toward the parent, or some other substantial erosion of the
>> relationship between the parent and the child[.]

Miss. Code Ann. § 93-15-121(c)-(f).　The youth court determined that both parents

---

[6] In 2016, the Legislature amended the Mississippi Termination of Parental Rights
Law, deleting the prerequisites formerly provided in section 93-15-103(1) and setting forth
the requirements for termination of parental rights in sections 93-15-115 to 93-15-121. *See*
2016 Miss. Laws ch. 439, § 9 (H.B. 1240).　These new statutes were enacted prior to the
TPR hearings and were cited in the youth court's findings of fact and final judgment.

11

suffer[ed] from habitual alcoholism or other drug addiction and [had] failed to successfully complete alcohol and/or drug treatment, . . . [were] unwilling to provide reasonably necessary food, clothing, shelter, or medical care for [John], . . . failed to exercise reasonable visitation or communication with the child, . . . [and that their] abusive or neglectful conduct ha[d] caused, at least in part, an extreme and deep-seated antipathy toward the parent[.]

Kirkley appeals from the judgment, claiming that the youth court failed to make specific findings of fact regarding the grounds for termination of Kirkley's parental rights and erred in adopting the GAL's recommendation, which he claims failed to show that the GAL made any independent investigation.

### A. The GAL's Findings

¶22. Mississippi Code Annotated section 93-15-107(1)(d) (Supp. 2016) requires that a GAL be appointed to protect the interest of the child in a termination-of-parental-rights case. A GAL's requirements are to "be competent, without interests adverse to the child, and adequately informed as to her duties," as well as "to act as a representative of the court and to assist the court in protecting the interests of an incompetent person by investigating and making recommendations to the court." *R.L. v. G.F.*, 973 So. 2d 322, 325 (¶11) (Miss. Ct. App. 2008) (citation and internal quotation marks omitted).

¶23. At the March 2018 hearing, Kirkley's attorney objected to the admission of the GAL's report as hearsay, but the youth court judge overruled the objection, noting that a GAL report is required. Kirkley argues on appeal that the court erroneously relied on the GAL's report because there is no documentation by the GAL that she "ever personally observed, or interviewed or even spoke to the child, the father, or the mother."

¶24. It is admittedly unclear from the record whether the GAL met or interviewed the child

12

or Kirkley independently. However, in *R.F. v. Lowndes County Department of Human Services*, 17 So. 3d 1133, 1139 (¶20) (Miss. Ct. App. 2009), this Court held that while it "may be appropriate" for the GAL to contact or interview the natural parent, it is not required. As the record indicates, Kirkley was incarcerated during much of this period.

¶25.    With regard to a GAL's failure to conduct an interview with the child, the supreme court has stated that it would be difficult "to imagine that a [GAL], without ever visiting the children he/she represents, can be fully informed as to their best interests." *M.J.S.H.S. v. Yalobusha Cnty. Dep't of Human Servs. ex rel. McDaniel*, 782 So. 2d 737, 741 (¶16) (Miss. 2001). In *M.J.S.H.S.*, the GAL based his recommendation that the mother's parental rights should be terminated "on records and reports from [DHS], and conversations with [the social worker] and the [child's therapist]." *Id*. at 739 (¶7). The GAL did not speak with the children or mother. *Id*. The supreme court vacated the termination of parental rights and remanded for a hearing due to the GAL's failure "to 'zealously' inquire into and protect [the children's] best interest." *Id*. at 741 (¶18). A year later, in *D.J.L. v. Bolivar County Department of Human Servs. ex rel. McDaniel*, 824 So. 2d 617, 622 (¶17) (Miss. 2002), the supreme court remanded for a limited hearing due to the GAL's reliance on the transcript from the termination hearing and failure to provide a report/recommendation until almost one year after the TPR order. The GAL's report "merely acknowledge[d] that the [GAL] agree[d] with the recommendation of the Bolivar County CASA worker in that the son and daughter should remain in the custody of DHS with plans of attempting adoption." The supreme court further noted:

13

> There is nothing in the record to indicate that the guardian ever talked privately with the children as required by *M.J.S.H.S.* There was no independent report presented to the trial court during the hearing or prior to the judge's decision. The guardian did not testify, as has occurred in some cases, but only limited himself to the cross-examination of other witnesses.

*Id*.

¶26. "[T]he sole reason for the appointment a [GAL] is to ensure that the best interest of a minor child is fully sought out and protected." *M.J.S.H.S.*, 782 So. 2d at 741 (¶17) (citing Miss. Code Ann. § 93-15-107 (Rev. 1994). In this case, incorporating the GAL's findings into its judgment, the youth court determined that the GAL was "experienced and qualified" and "did a thorough and competent investigation." We agree. Lee, the GAL, participated in every youth court hearing and listened to testimony by Kirkley, Cavanagh, the foster mother, and Sims. Further, unlike *D.J.L.*, Lee provided a thirteen-page report and recommendation on November 7, 2017, which included an extensive and detailed case history of the court hearings and all visits/communications between the child, natural parent(s), the DHS, and the foster parents, dating from April 17, 2015, to October 25, 2017. With regard to the child's well-being, the GAL's report indicates specific knowledge of the child's development while in custody, stating:

> [John] remains in the home of his foster family . . . where he was placed on the date of custody, April 17, 2015, at the age of five months. [John] will turn [three] years old . . . [and] will have celebrated all three (3) of his birthdays in the State's custody.

> [John] is a happy, smart child. He can count to 20, knows most of his ABC's and his primary colors. He is very verbal[,] and his pediatrician says he is more on the level of a 4-5 years old, according to the foster mother. He has no known medical issues.

14

[John] loves all things outdoors and his favorite thing is to help his foster dad, who is a mechanic, do anything that requires working with tools. He is bonded with the immediate and extended foster family and refers to them as daddy, mama, sissy, nana, etc.

The report concluded, "[Kirkley] has had very few visits with the child since the date of custody as he has been incarcerated. Currently, it is my understanding that he is serving a three (3) year sentence. Due to his incarceration and lack of contact[,] the father does not have a bond with the child." Although Kirkley claims that the GAL's conclusion indicates that her knowledge of the case is simply that—just an "understanding"—nothing in the evidence or Kirkley's testimony contradicted the GAL's findings. Lee also testified at the hearing as to her findings in the report, and the testimony by the foster parent and Sims corroborated the GAL's report/case history.

¶27. At trial, Kirkley's attorney did not object to the sufficiency of the investigation conducted by the GAL; nor did he file any post-trial motions concerning the GAL investigation or lack thereof. Consequently, because the issue is now raised for the first time on appeal, the youth court never had an opportunity to address it. It is important to note that the order appointing the GAL for purposes of the TPR hearing in this case was to represent the "best interest" of the child and did not command a separate investigation from that already conducted by DHS.

¶28. Accordingly, because the findings in the GAL's report are consistent with the evidence and Kirkley's own testimony, we find that, in this instance, any alleged failure by the GAL to visit with Kirkley or John independently does not warrant either vacating the youth court's termination of Kirkley's parental rights or a remand for further proceedings.

15

This argument is without merit.

B. *Termination of Parental Rights Factors*

¶29. Kirkley also contends the youth court's conclusions concerning the termination of his parental rights were not supported by clear and convincing evidence. We will address, in turn, each of the factors discussed by the court in its findings.

i. *Habitual Alcoholism and Drug Addiction*

¶30. The youth court found in its April 19, 2016 order that Kirkley had "failed to complete [alcohol and drug] treatment, and later was arrested on August 1, 2015." Kirkley claims that the youth court erred in finding that he suffered from alcoholism or drug addiction and that he had failed to successfully complete alcohol and drug treatment programs.

¶31. Kirkley was arrested twice in April 2015 for possession of controlled substances. He contends that his incarceration restricted his opportunities to comply with the court's requirement, but as CPS argues in its brief,

> [Kirkley] did not remain incarcerated throughout the entire case. There were several times that he was free and capable of showing [DHS] that he could maintain a stable, drug free lifestyle. However, it was [his] choice[] to continue to engage in criminal behavior and drug use that prevented him from proving that he could maintain that lifestyle.

As the court noted, although Kirkley "was ordered to drug court and . . . was participating in the love in action ministries in Laurel, MS," the program's director told the youth court judge that Kirkley had left the program. The only evidence presented by Kirkley that he completed any program was a certificate from a "Life Learning Program" while incarcerated that was not approved by the court or CPS. Thus, we find no error in the youth court's

16

finding that Kirkley suffered from habitual alcoholism or drug addiction and failed to complete alcohol/drug treatment.

### ii. Unwillingness to Provide Reasonable Necessary Food, Clothing, Shelter, or Medical Care

¶32. We further find no error in the youth court's determination that Kirkley was "unwilling to provide reasonably necessary food, clothing, shelter, or medical care for the child." In April 2015, while under the parents' care, the child was found in a motel room with controlled substances present. When asked at the November 2017 TPR hearing if he agreed that he "ha[d] not been able to provide [the] child a stable, drug-free and violence-free home environment because [he had] been incarcerated," Kirkley replied, "Yes, ma'am." Kirkley's pattern of criminal behavior and his failure to contribute to the child's well-being during the thirty-one months John was in the DHS's custody constituted clear and convincing evidence that Kirkley was unwilling to provide adequate care for the child.

### iii. Failure to Exercise Reasonable Visitation or Communication with Child

¶33. With regard to Kirkley's claim that he was deprived of chances to interact or communicate with the child, the DHS social worker, Sims, explained at the November 2017 hearing that the agency's policy is not to take children to visit an incarcerated parent. Subsequently, at the January 2018 hearing, when Sims was asked if she felt "that [DHS] could have made any additional efforts as far as reunification with Mr. Kirkley," she replied, "With Mr. Kirkley, no. Again, as you see, he is still incarcerated, and we're very limited with what we can do." The GAL's report indicated that DHS representatives visited Kirkley

17

in Harrison County detention facilities in February and March 2017, but noted that "there [was] no clear release date." As Sims aptly noted at one of the hearings,"[I]t was not the agency['s] choice that Mr. Kirkley decided to be in and out of jail[.]" We find the court's determination that Kirkley "failed to exercise reasonable visitation or communication with the child" is supported by the evidence.

            *iv.*      *Abusive or Neglectful Conduct Causing Extreme and Deep-seated Antipathy by the Child toward the Parents*

¶34. The youth court found that Kirkley was unable to sustain a relationship with his son due to the child's young age and Kirkley's incarceration. Kirkley argues that his incarceration cannot be the sole basis for finding his relationship with John was eroded or non-existent, and he claims the relationship was "worsened by the youth court and [DHS]." Noting his letters addressed to the youth court, Kirkley contends that he had made attempts to establish a relationship with the child.

¶35. "A finding of substantial erosion of the parent/child relationship necessarily involves a consideration of the relationship as it existed when the termination proceedings were initiated." *In re K.D.G. II*, 68 So. 3d 748, 752-53 (¶22) (Miss. Ct. App. 2011) (quoting *G.Q.A. v. Harrison Cnty. Dep't of Human Res.*, 771 So. 2d 331, 338 (¶29) (Miss. 2000)). For over a year prior to the TPR proceedings, John remained in DHS custody, with minimal contact with his natural father due to Kirkley's incarceration. At the time the termination proceedings were initiated, Kirkley was still incarcerated, and John had been in foster care for almost two years. As noted by the GAL in her report, John identified the foster parents

18

as his parents, calling them "daddy" and "mama." The GAL further remarked in her testimony that she was not sure that "the child would even recognize [Kirkley]."

¶36. In its findings of fact and conclusions of law, the youth court recognized that "[a]lthough incarceration cannot be the sole basis for termination, the results, i.e. erosion or non-existence of the relationship, can be considered a significant factor when determining whether rights should be terminated." (Citing *In re Clark*, 611 P.2d 1343, 1345 (Wash. Ct. App. 1980)).[7] We addressed a similar situation in *In re K.D.G. II*, 68 So. 3d 748, 753 (¶22) (Miss. Ct. App. 2011), where the father had been incarcerated for three of the six years his children were in the custody of the DHS. This Court found clear and convincing evidence to support the youth court's termination of parental rights, holding:

> Here, the eroded relationships were a result of KDG's actions. . . . [T]he youth court provided KDG the opportunity to act as a father to his sons through complying with the permanency order—an opportunity, the youth court found, he totally walked away from. The youth court weighed this along with the fact KDG had been out of jail for over a year and a half prior to the permanency order without making significant efforts to communicate with or support his sons."

Kirkley's illegal activities and continuous incarceration were of his own making; it was not the fault of the court or the DHS. Further, we reiterate the CPS's argument that Kirkley had an opportunity to demonstrate that he "could maintain a stable, drug free lifestyle," but he continued to use drugs and "engage in criminal behavior." Therefore, we find no manifest error in the youth court's determination that Kirkley's absence and lack of communication

---

[7] In *Clark*, 611 P.2d at 1345, the Court of Appeals of Washington held, "Mere imprisonment of the father is not sufficient of itself for an order of deprivation, but it is not a factor to be ignored."

19

between him and his son had resulted in a substantial erosion of the parent-child relationship.

¶37. Accordingly, we find the court did not err in finding "by clear and convincing evidence" that it was in the child's best interest to terminate Kirkley's parental rights.

¶38. **AFFIRMED.**

**CARLTON, P.J., GREENLEE AND LAWRENCE, JJ., CONCUR. WILSON, P.J., AND McDONALD, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY McDONALD AND McCARTY, JJ. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY WESTBROOKS AND McDONALD, JJ.**

**WESTBROOKS, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶39. I join Judge McCarty's separate opinion that the summons triggers due process concerns, while agreeing with the majority that jurisdiction is proper. I write separately to address the other concerns raised by this case, finding portions of the decision of the youth court to be manifestly wrong and unsupported by substantial, credible evidence. More specifically, the guardian ad litem did not conduct a zealous investigation, and the termination of parental rights was not supported by substantial evidence. Additionally, this case presents the question—though no one raised it—when does the right to counsel attach in abuse and neglect proceedings?

**A. The right to counsel should attach at the beginning of youth court proceedings.**

¶40. This proceeding did not give true deference to the weight and lifelong effects it would have on this family and families later to come. "The United States Supreme Court has

20

unequivocally recognized that parental rights are a matter of fundamental constitutional significance." *G.Q.A. v. Harrison Cnty. Dep't of Human Res.*, 771 So. 2d 331, 335 (¶11) (Miss. 2000) (citing *Santosky v. Kramer*, 455 U. S, 745 (1982)). "Parents have a liberty interest, more precious than any property interest, in the care, custody, and management of their children and families." *Id.* "That interest is afforded great protection by the courts." *Id.* "Indeed, the United States Supreme Court has stated that few forms of state action are so severe and so irreversible as termination of parental rights, leaving a parent with no rights to visit or communicate with the child." *Id.* Although labeled as a civil matter, a TPR proceeding is comparatively punitive, leaving one to wonder when fundamental constitutional protections attach to afford the indigent zealous and competent advocacy to protect the liberty interest in the right to parent.

¶41. "The Sixth Amendment right to counsel is 'offense' specific and does not attach until prosecution begins." *Howell v. State*, 163 So. 3d 240, 253 (¶33) (Miss. 2014); *Weeks v. State*, 804 So. 2d 980, 995 (¶55) (Miss. 2001) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 174-77 (1991)). In *McNeil*, the United States Supreme Court explained, "The purpose of the Sixth Amendment counsel guarantee—and hence the purpose of invoking it—is to protect the unaided layman at critical confrontations with his expert adversary, the government, after the adverse positions of government and defendant have solidified with respect to a particular alleged crime." *McNeil*, 501 U.S. at 177-78. Thus, the Sixth Amendment right to counsel attaches once the government has initiated charges "with respect to a particular alleged crime." *Id.*

¶42. Arguably, the Sixth Amendment right to counsel should also attach once adjudication proceedings commence. Youth court adjudication proceedings can have punishments that follow; therefore indigent defendants should be appointed counsel at the beginning of these proceedings once the "prosecution begins." The argument that the Sixth Amendment right to counsel should not attach to youth court adjudication proceedings because they are civil in nature cannot withstand attack. Youth court proceedings have vivid similarities to that of criminal proceedings, such as a defendant and prosecutor, an alleged crime, and the possible result of punishment. Youth court defendants are facing critical confrontations with an expert adversary, the government, and should not be left unaided. Parents are often left unaided until they face the most disastrous punishment of family law—termination of parental rights. Although adjudicatory hearings do not lead directly to incarceration, termination of parental rights is still punishment in nature.

¶43. The "appointment of counsel in termination proceedings, while wise, is not mandatory and therefore should be determined by state courts on a case-by-case basis." *K.D.G.L.B.P. v. Hinds Cnty. Dep't of Human Servs.*, 771 So. 2d 907, 910 (¶12) (Miss. 2000) (citing *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 34-35 (1982)). While appointment of counsel has been determined to not be an absolute right by the United States Supreme Court, Mississippi courts have gone a step further by creating expansive law granting indigent persons the right to counsel in termination cases. If the court determines that a parent or guardian who is a party in an abuse, neglect, or termination of parental rights proceeding is indigent, the youth court judge may appoint counsel to represent the indigent parent or

22

guardian in the proceeding. *E.K. v. Miss. Dep't of Child Prot. Servs.*, 249 So. 3d 377, 382 (¶19) (Miss. 2018). The act can be commended, but we must now encourage our courts to go even further by appointing counsel to the indigent for all adjudication proceedings. One of the most important factors to be considered in applying the standards for court appointed counsel is whether the presence of counsel would have made a determinative difference. *K.D.G.L.B.P.*, 771 So. 2d at 910 (¶12). Being represented by counsel could arguably always make a determinative difference. The manifest error that occurred in this case arguably could have been avoided if Kirkley would have been given the aid of counsel at an earlier stage.

**B.     The investigation by the guardian ad litem was inadequate.**

¶44.    In addition to the previously mentioned summons Judge McCarty addresses, the investigation by the guardian ad litem (GAL) raises great concern.  The GAL conducted an investigation that was below standards and did not display zealous advocacy. Our case law states that guardians ad litem do not have an option to perform or not perform, rather they have an affirmative duty to zealously represent the child's best interest. *M.J.S.H.S. v. Yalobusha Cnty. Dep't of Human Servs.*, 782 So. 2d 737, 740 (¶14) (Miss. 2001). "[A] guardian ad litem appointed to investigate and report to the court is obligated to investigate the allegations before the court, process the information found, report all material information to the court, and (if requested) make a recommendation." *S.G. v. D.C.*, 13 So. 3d 269, 282 (¶57) (Miss. 2009). "However, the guardian ad litem should make recommendations only after providing the court with all material information which weighs on the issue to be decided by the court, including information which does not support the

recommendation." *Id.* "The court must be provided all material information the guardian ad litem reviewed in order to make the recommendation." *Id.* In this instance, the GAL presented the court with information that the court was already privileged to. She simply appeared in court, documented what occurred, and labeled it as an investigation. This GAL did not even present documentation to support her recommendation or findings such as a reporting on the home of the foster parents, documentation attesting to what she claims the pediatrician reported, or documentation reflecting the drug screening results. The majority highlights that this GAL submitted a thirteen-page report, but this report is completely unreasonable for a case that spans over three years. The report should have provided much more evidence and highlighted a thorough investigation instead of regurgitating a timeline of courtroom events. She did not take time to interview the birth parents or minor child. The Supreme Court of Mississippi has previously stated, "It is hard for this Court to imagine that a guardian ad litem, without ever visiting the children he/she represents, can be fully informed as to their best interests." *M.J.S.H.S.*, 782 So. 2d at 741 (¶16). The Mississippi Supreme Court has overturned cases "[b]ecause guardian ad litem failed to fully represent the child's best interest." *Id.* For the above mention reasons, I would reverse and remand the case.

### C. There was not clear and convincing evidence to support a TPR.

¶45. The youth court also erred when finding that there was clear and convincing evidence necessary for terminating Kirkley's parental rights. Mississippi Code Annotated section 93-15-115 (Rev. 2015) outlines the guidelines for involuntary termination when a child is in

24

custody or under supervision of the Department of Child Protection Services (CPS), stating:

> When reasonable efforts for reunification are required for a child who is in the custody of, or under the supervision of, the Department of Child Protection Services pursuant to youth court proceedings, the court hearing a petition under this chapter may terminate the parental rights of a parent if, after conducting an evidentiary hearing, the court finds by clear and convincing evidence that:
>
> (a) The child has been adjudicated abused or neglected;
>
> (b) The child has been in the custody and care of, or under the supervision of, the Department of Child Protection Services for at least six (6) months, and, in that time period, the Department of Child Protection Services has developed a service plan for the reunification of the parent and the child;
>
> (c) A permanency hearing, or a permanency review hearing, has been conducted pursuant to the Uniform Rules of Youth Court Practice and the court has found that the Department of Child Protection Services, or a licensed child caring agency under its supervision, has made reasonable efforts over a reasonable period to diligently assist the parent in complying with the service plan but the parent has failed to substantially comply with the terms and conditions of the plan and that reunification with the abusive or neglectful parent is not in the best interests of the child; and
>
> (d) Termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome based on one or more of the grounds set out in Section 93-15-119 or 93-15-121.

¶46. Although the minor child was adjudicated neglected and within the care, custody, and supervision of the CPS, reasonable efforts were not made to diligently assist Kirkley with complying with the service plan. I am not dismissive of the fact that Kirkley did have a substance abuse problem and struggled with the service plan, but, we must give credit to the fact that he did avail himself to many rehabilitation programs while incarcerated. Substance abuse and addiction are medical problems that do not dissipate simply because a service plan

25

is issued. Although Kirkley initially struggled with his rehabilitation, as many do, he made considerable efforts to regain sobriety and to be actively engaged in matters concerning his child by constantly calling and writing the court. The service plan was not amended to correlate with the restraints of his incarceration that would have allowed for deference to be given to the programs he completed during his incarceration.

¶47. In addition, the grounds set forth in section 93-15-121 were not established by clear and convincing evidence. The youth court based its ruling on the following grounds:

> (c) The parent is suffering from habitual alcoholism or other drug addiction and has failed to successfully complete alcohol or drug treatment;
>
> (d) The parent is unwilling to provide reasonably necessary food, clothing, shelter, or medical care for the child; reasonably necessary medical care does not include recommended or optional vaccinations against childhood or any other disease;
>
> (e) The parent has failed to exercise reasonable visitation or communication with the child;
>
> (f) The parent's abusive or neglectful conduct has caused, at least in part, an extreme and deep-seated antipathy by the child toward the parent, or some other substantial erosion of the relationship between the parent and the child;

Miss. Code Ann. § 93-15-121 (Rev. 2015).

¶48. Again, Kirkley initially struggled with a drug addiction but there is clear and convincing evidence that he successfully completed alcohol and drug treatment while incarcerated. The youth court simply deemed this unsatisfactory because the programs were not the initial programs of service agreement, but made no efforts to accommodate the situation at hand by amending the plan to reflect programs available to Kirkley. Youth courts are known to modify service plans for individuals that relocate; Kirkley simply relocated to

26

a detention facility and should not have been treated differently due to his location.

¶49. The statute is also very clear that the parent must be *unwilling* to provide necessary food, clothing, shelter, or medical care for the child. There is an even clearer distinction between one's unwillingness and inability. Kirkley was *unable* to provide for his son while incarcerated; but despite this, he constantly wrote the court seeking information about the foster parents to provide assistance to his son. Unfortunately, neither the court nor CPS responded to his letters.

¶50. Kirkley was also unable to visit or communicate with the minor child. CPS does not take children to visit parents that are incarcerated; nor were caretakers of the minor willing to call or Skype Kirkley so that the two would be able to visit. The child's age was not a hindrance in facilitating a telephonic visitation because the GAL reported that the three-year-old child was smart and verbal with an ability to count to twenty and recite the alphabet and colors. CPS informed Kirkley that he could arrange visitation through the youth court. He was unsuccessful because he did not receive a response when he contacted the youth court.

¶51. There was no deep-seated antipathy between the child and father—only an erosion of the relationship furthered by personnel that handled this case who blocked all efforts of communication and visitation due to Kirkley's incarceration that was near an end. Due to the child's early age, the relationship could have easily been rekindled.

¶52. Simply put, the court became impatient and unsatisfied with Kirkley's progress and rushed this TPR proceeding along, finding the foster parents to be more fitting because they had the opportunity to develop a relationship with the child. The Mississippi Supreme Court

has never allowed the termination of parental rights only because others may be better parents. *M.L.B. v. S.L.J.*, 806 So. 2d 1023, 1029 (¶11) (Miss. 2000).

¶53. For these reasons, I respectfully concur in part and dissent in part.

**McDONALD AND McCARTY, JJ., JOIN THIS OPINION IN PART.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶54. The Jackson County Youth Court summons violates state law on its face, and those violations trigger serious due process implications for parents. We should not hold that this error-filled document "substantially complies" with anything—not the statute, which is plainly deviates from, or our precedent, which it ignores.

¶55. This point is important because it goes beyond Kirkley's interest in this case. "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). And "[i]n Mississippi . . . there exists a strong presumption in favor of preserving parental rights." *In re A.M.A.*, 986 So. 2d 999, 1009 (¶22) (Miss. Ct. App. 2007). So we need to be accurate at every phase of the termination of parental rights process in order to safeguard the liberty interest parents have in their children.

¶56. In accord with this settled law, the Legislature has decided parents in Youth Court proceedings have a right to counsel. Miss. Code Ann. § 43-21-201 (Rev. 2015). The Supreme Court has strongly enforced this due process requirement and reversed when it was not honored. *See In re I.G.*, 467 So. 2d 920, 923 (Miss. 1985); *E.K. v. Miss. Dep't of Child*

28

*Prot. Servs.*, 249 So. 3d 377, 383 (Miss. 2018).

¶57.   To safeguard that liberty interest, the Legislature put together a form to use when summoning a parent.  It covers all the bases, and in relevant part states:

> You have a right to be represented by an attorney.  You are requested to immediately notify the youth court of the name of your attorney.  If indigent, the above-named child has a right to have an attorney appointed for [them] free of charge, and should immediately apply to the youth court for such appointed counsel.  You have a right to subpoena witnesses in your behalf.

Miss. Code Ann. § 43-21-503 (Rev. 2015).

¶58.   Jackson County uses exactly *none* of the statute's form language.  Instead of this plain and unambiguous language, Jackson County only issues the following notice:

> **IMPORTANT NOTICE: [PARENTS] YOU MUST BE REPRESENTED BY AN ATTORNEY IN THIS CASE UNLESS THE RIGHT TO LEGAL REPRESENTATION IS WAIVED.**

¶59.   To fulfill the law, a reasonable party would simply use the form provided by the Legislature. The summons Jackson County used wholly disregards the language of the statute and does not come close to the requirement that it "substantially comply," which it is bound to do by law by the Legislature's usage of the word "shall."  *See E.K.*, 249 So. 3d at 383 (¶21) (holding that the word "may" is discretionary and that "shall" is mandatory). The summons plainly and obviously does not follow the guidance of section 43-21-503.

¶60.   Ultimately, this improper summons did not harm the appellant in this case, as he was later appointed counsel.  I agree that it may not have impacted the father here or require reversal in this appeal.  Nonetheless, the violations of due process contained in this summons will foreseeably have an impact on others in the future—and in this most sensitive

kind of all proceedings.

¶61.    I agree with the rest of the majority's conclusions.  However, because the summons

used by the Jackson County Youth Court not only fails to "substantially comply" with the

statute but also materially deviates from it, I respectfully dissent in part.

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION IN PART.**