771 So.2d 331 (2000)
G.Q.A. and R.S.A.
v.
HARRISON COUNTY DEPARTMENT OF HUMAN SERVICES, State of Mississippi, P.W.H. and S.A.H.
No. 1999-CA-00617-SCT.
Supreme Court of Mississippi.
October 26, 2000.
*332 Carol L. Henderson, Gulfport, Psonya C. Wilson, Attorneys for Appellants.
Kaye J. Persons, Biloxi, Attorney for Appellees.
EN BANC.
DIAZ, Justice.
¶ 1. G.Q.A. and R.S.A. are the natural parents of A.N.A. A.N.A., along with her natural sibling J., and her half-siblings, K. and D., were removed from the custody of their natural parents after A.N.A. suffered severe burns over much of her middle and lower back. After her release from the hospital, A.N.A. was placed in the home of foster parents P.W.H. and S.A.H., who successfully petitioned the Harrison County Family Court for the termination of the parental rights of the natural parents. From that judgment, the natural parents bring this appeal.

STATEMENT OF THE FACTS
¶ 2. In July of 1993, A.N.A., an eighteen-month-old baby girl, was taken to Biloxi Regional Hospital by her parents to be treated for a severe burn. A.N.A. was transferred to the pediatric intensive care unit (PICU) at the University of South Alabama Medical Center in Mobile, Alabama. Her treating physician, Dr. Diana Lyn Davidson, testified to facts regarding A.N.A.'s medical condition and treatment. A.N.A. had a third-degree burn covering approximately 22% of her body concentrated on her lower back, buttocks, and the back of her legs. Because her parents waited an estimated seven to nine days before bringing her to the hospital seeking medical attention, A.N.A. developed a serious case of ecthyma gangrenosum. This bacterial infection caused abscesses to develop on her forehead, arms, legs and chest; areas unaffected by the initial burn.
¶ 3. Dr. Davidson testified that development of ecthyma gangrenosum in a burn *333 victim is rare because the infection is normally prevented with a routine antibiotic treatment. In fact, Dr. Davidson found this case to be so unusual that she later wrote and presented a case study of A.N.A.'s treatment, explaining the procedures used to inject various antibiotics into the cleaned abscesses, an antiquated treatment by today's standards because of the availability of normal antibiotic care.
¶ 4. Dr. Davidson also testified that A.N.A. was severely malnourished, noting that A.N.A. had the height and weight of an eight month old, that she had hair loss, loose teeth, and swollen and bleeding gums. All of these maladies can be traced to malnourishment. Dr. Davidson further testified that A.N.A. had been malnourished for at least four of five months in order to affect her stature and weight to such a severe degree.
¶ 5. Because of the severity of the burn, A.N.A. developed fluid around her heart, causing cardiac problems secondary to the burn. Dr. Davidson did not expect A.N.A. to live through her injuries during her first few days of hospitalization. She remained in the PICU for almost a month and in the hospital for over two months. Although A.N.A. received initial treatment for the burn and subsequent infection, she continues to receive physical therapy to combat the lack of joint flexibility caused by the scarring of her wounds. Similar treatment will be necessary for the rest of her life. This is, of course, in addition to the skin grafting and extensive plastic surgery necessary to minimize the disfiguring nature of her wounds.
¶ 6. The natural mother, G.Q.A., testified that she accidentally burned A.N.A. while giving her a bath, refusing to acknowledge any intentional abuse. G.Q.A. explained that on the evening in question she undressed the baby, turned on the water, and placed the baby in the bathtub. She then went into the kitchen to get a cup to use to pour water over the baby while bathing her. She heard A.N.A. crying and returned to the bathroom to find the baby clutching the sides of the tub, as if she wanted to get out of the water. Thinking the baby simply wanted to avoid a bath, G.Q.A. attempted to hurriedly bathe A.N.A. She placed the cup under the faucet and poured the water onto the baby's lower back. When the baby screamed, G.Q.A. noticed that the water was too hot. She took A.N.A. into the bedroom and treated her with some burn ointment that she found in a first aid kit. While G.Q.A. admits that the burn appeared to be bad, she claims that she did not realize the severity of the burn. She claims that the baby could still crawl and that the wound appeared to be healing as evidenced by the thick scab that covered it. Even though A.N.A. developed a fever and sores on her body, G.Q.A. believed the baby was getting better.
¶ 7. In addition, G.Q.A. testified that she did not seek immediate medical treatment for the child because she feared that A.N.A. might be taken from her. G.Q.A., a native of Mexico, claimed that relatives in Florida told her that if anything happened to your children, the Department of Human Services would remove them and place them with other families. G.Q.A. did, however, testify that she called the hospital to inquire how to treat a burn and believed applying the burn ointment was sufficient treatment.
¶ 8. Regarding Dr. Davidson's testimony concerning A.N.A.'s malnourishment, G.Q.A. originally told investigators that A.N.A. did not have a sustained appetite. At trial, G.Q.A. introduced A.N.A.'s previous medical records to show that she was under the regular care of a pediatrician and exhibited consistent weight gain just two months prior to the burn. The physician who examined A.N.A. noted that she was underweight, but did not document or mention malnourishment. G.Q.A. testified that she told the physician that A.N.A. would eat excessively and then vomit. The physician suggested that she feed A.N.A. smaller amounts of food more frequently. G.Q.A. testified that when she told the *334 investigators that A.N.A. did not have much of an appetite, she meant that A.N.A. could not digest enough of her food before regurgitation to provide genuine nourishment.
¶ 9. R.S.A., the natural father, alleged that he knew nothing of the child's burn until the day they took her to the hospital. He claimed his ignorance of the child's condition derived from the long hours he worked and the fact that he was not actively involved in caring for his children. Although both parents showed remorse over the child's condition, neither parent admitted any intentional abuse.
¶ 10. At the hearing to terminate the parental rights, Dr. Davidson was qualified and accepted as an expert in the fields of psychology and pediatric medicine. Dr. Davidson testified that it was her expert opinion that A.N.A.'s condition could not have resulted from circumstances other than intentional abuse. Dr. Davidson based her opinion on the fact that there was a sharp demarcation of the wound, a "textbook" sign of a child that had been dipped in scalding water. Also, there were no secondary splash burns indicative of an accidental immersion in water. She further testified that the physical evidence contradicted G.Q.A.'s testimony that A.N.A. was active and crawling after she was burned, but before receiving medical treatment. Dr. Davidson explained that burn wounds generally cause blood vessels to leak, leading the skin and underlying tissue to develop a puffy texture. A.N.A. had an accumulation of fluid in the middle posterior section of her body, indicating that she had been lying on her back for several days. A.N.A.'s hair loss on the back of her head provided further supplemental evidence of her immobility. Dr. Davidson concluded that A.N.A. would have been in excruciating pain and only able to move with great difficulty.
¶ 11. A.N.A.'s natural parents told Dr. Davidson upon A.N.A.'s admittance to the hospital that A.N.A. was mentally retarded. Dr. Davidson soon discovered that A.N.A. suffered from a neurological nerve condition called agenesis corpus callosum, not mental retardation. G.Q.A. explained that she was trying to tell the doctor about this condition and does not believe her child is mentally retarded. Initially, it was very difficult to communicate with A.N.A. on any level as she was essentially non-responsive. However, Dr. Davidson soon learned that A.N.A.'s lack of speech was merely the result of a language barrier. A.N.A. only spoke Spanish and was able to communicate through a translator. During her recovery, A.N.A. was able to walk and talk with no sign of mental retardation.
¶ 12. Dr. Davidson also testified that A.N.A.'s malnourishment was severe and easily detectable from her small size and swollen and bleeding gums, indicating chronic malnutrition, protein and vitamin deficiencies. Dr. Davidson's expert opinion was that A.N.A. was intentionally malnourished.
¶ 13. Based on Dr. Davidson's medical examination and expert opinion, the trial judge found that A.N.A. had been intentionally abused. He terminated the parental rights of G.Q.A. and R.S.A., finding that they were responsible for a series of abusive incidents, that they had failed to eliminate their behavior through meaningful counseling, and that there had been a substantial erosion of the parent/child relationship due in part to the parents' serious abuse, thus preventing A.N.A.'s return to the natural home. See Miss.Code Ann. § 95-15-103 (Supp.1999). The Family Court judge ordered A.N.A.'s current foster parents, P.W.H. and S.A.H., be given permanent custody of her. P.W.H. and S.A.H. have maintained continual custody of A.N.A. since her release from the hospital.

STANDARD OF REVIEW
¶ 14. This appears to be the first time that a case involving the termination of parental rights originating in Family *335 Court has been reviewed by this Court. A Family Court judgment concerning termination of parental rights will be reviewed under the same standard as a Chancery Court judgment, which is clear and convincing evidence. See Miss.Code Ann. § 93-15-109 (Supp.1999). Therefore, we review this case under our familiar clearly erroneous/manifest error standard. Although both courts are vested with the power to determine whether parental rights should be terminated, it is important to note that the chancery court derives its jurisdictional authority from Mississippi's Constitution of 1890 while the Family Court is a creature of statute. See Miss. Const. art. 6, § 159; Miss.Code Ann. § 93-15-105 (1996). The Family Court's decision will be upheld unless this Court finds it to be unsupported by substantial, credible evidence, giving deference to the Family Court's findings of fact. S.C.R. v. F.W.K., 748 So.2d 693, 700 (Miss.1999).
¶ 15. Substantial evidence has been defined as "such relevant evidence as reasonable minds might accept as adequate to support a conclusion" or to put it simply, more than a "mere scintilla" of evidence. Hooks v. George County, 748 So.2d 678, 680 (Miss.1999). Where there is substantial evidence to support the trial court's findings, this Court is without the authority to disturb its conclusions, although we might have found otherwise as an original matter. In re Estate of Harris, 539 So.2d 1040, 1043 (Miss.1989).

DISCUSSION
¶ 16. The United States Supreme Court has unequivocally recognized that parental rights are a matter of fundamental constitutional significance. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Lassiter v. Department of Soc. Servs., 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). Parents have a liberty interest, more precious than any property interest, in the care, custody, and management of their children and families. Santosky v. Kramer, 455 U.S. at 753-54, 758-59, 102 S.Ct. 1388. That interest is afforded great protection by the courts. Id. at 754, 102 S.Ct. 1388. Indeed, the United States Supreme Court has stated that few forms of state action are so severe and so irreversible as termination of parental rights, leaving a parent with no rights to visit or communicate with the child. Id. at 759, 102 S.Ct. 1388; Lassiter, 452 U.S. at 39, 101 S.Ct. 2153 (Blackmun, J., dissenting), cited in M.L.B. v. S.L.J., 519 U.S. 102, 118-19, 117 S.Ct. 555, 564-65, 136 L.Ed.2d 473 (1996).

I. TERMINATION OF PARENTAL RIGHTS

A. Miss.Code Ann. § 93-15-103(3)(c) Series of Abusive Incidents
¶ 17. The Family Court determined that parental rights should be terminated applying Miss.Code Ann. § 93-15-103(3)(c),(e)(ii), and (f). Parental rights may be terminated if a parent has been responsible for a series of abusive incidents towards a child. Miss.Code Ann. § 93-15-103(c).
¶ 18. The Family Court found by clear and convincing evidence that A.N.A. had been intentionally burned. The trial judge's opinion clearly stated that the expert testimony of Dr. Davidson, the physical evidence, and various exhibits presented at numerous hearings prove the parents' version of the events to be false. The trial judge also found that withholding medical treatment from A.N.A. allowed her condition to deteriorate to the point that a terrible odor emitted from her body due to the serious infection from the burn. Because of the infection, she suffered in agony for at least four days. The trial judge found that this chain of events constituted a second incident of abuse. Lastly, the lower court found that the extent of A.N.A.'s malnutrition constituted an additional, separate incident of abuse. Upon this evidence, Family Court Judge Michael H. Ward concluded that the parental rights of G.Q.A. and R.S.A. should be terminated.
*336 ¶ 19. G.Q.A. and R.S.A. argue that A.N.A. was not intentionally abused. The parents allege that A.N.A.'s burn was accidental, constituting negligence since G.Q.A. admittedly should not have left the baby unattended. G.Q.A. maintains that she did not know the baby was in such serious condition and genuinely believed A.N.A.'s wound was healing, and not in need of medical attention. Based on this belief, she argues that she did not intentionally withhold medical treatment from the child. G.Q.A. further argues that the failure to give A.N.A. proper nourishment was not intentional, but resulted as a by-product of doctor's orders that she feed the child only small amounts of food at frequent intervals to keep her from vomiting. The parents argue that they are not guilty of a series of abusive incidents, but only one lapse in parental judgment by allowing A.N.A. to be burned by the hot water.
¶ 20. The Family Court decision is based on substantial, credible evidence, as the expert testimony by Dr. Davidson clearly contradicts G.Q.A. and R.S.A.'s argument that there was no intentional abuse. See Aldridge v. State, 398 So.2d 1308, 1309 (Miss.1981) (upholding a criminal conviction for felonious child abuse where there was a "marked discrepancy between the clinical findings and the historical data as supplied by the parents.").
¶ 21. There is substantial evidence to support the trial court's finding of abuse. We have held that in abandonment cases, the parent whose rights are sought to be terminated can be shown to have abandoned the child through one event, or through a course or pattern of conduct evidencing a desire to abandon the parental role. See Ethredge v. Yawn, 605 So.2d 761, 764 (Miss.1992); N.E. v. L.H., 761 So.2d 956, 963 (Miss.Ct.App.2000). That proof must be objectively considered under the totality of circumstances, keeping in mind the polestar concern of the best interest of the child. Id.; see also In re T.A.P., 742 So.2d 1095, 1101 (Miss.1999).
¶ 22. Congress recently enacted the Adoption and Safe Families Act of 1997 (ASFA), Pub.L. No. 105-89, 111 Stat. 2115 (1997), in order to increase the safety of children. In pursuing that goal, ASFA provides that "reasonable efforts" to reunite children with their parents "shall not be required ... if a court of competent jurisdiction has determined that (i) the parent has subjected the child to aggravated circumstances (as defined in State law, which definition may include but need not be limited to abandonment, torture, chronic abuse, and sexual abuse)." 42 U.S.C.A. § 671(a)(15)(D)(i) (Supp.2000). Essentially, ASFA clarifies that a child need not be forced to remain in or be returned to an unsafe home and allows the States to place the safety and welfare of the child before the interests of abusive parents. Since A.N.A., by and through her foster parents, filed the Petition to Terminate Parental Rights on February 28, 1997, this Act is not applicable to this case. It is, however, instructive as to the high priority placed on the child's continued safety and well-being.
¶ 23. In this case, the parents have not been, and will not be, allowed an opportunity to abuse this child again. Keeping in mind the constitutional mandate supporting parental rights, we find substantial credible evidence that indicates the natural parents were responsible for a series of abusive incidents against A.N.A.

B. Miss.Code Ann. § 95-15-103(3)(e)(ii) Failure to eliminate behavior identified by the Court, and that failure prevents return of the child to the parents.
¶ 24. The Family Court judge found that because the parents refused to acknowledge any form of abuse involving A.N.A., they did not benefit from the court-ordered counseling. Specifically, the trial court said that "[i]n the opinion of the Court, the failure on the part of the parents to acknowledge these forms of abuse and to receive counseling for same is tantamount *337 to receiving no counseling at all." The trial court adjudicated A.N.A. as an abused child, and the parents did not contest that finding. Therefore, the judge felt that the natural parents' refusal to participate in meaningful counseling constituted grounds for termination of their parental rights under this code section.
¶ 25. The parents argue that they attended counseling as ordered by the court and acquired a decent home with the necessary furnishings in order to have their children returned to them. The natural parents also allege that they do not have to admit to intentional abuse in order to prevent their parental rights from being terminated, relying on Veselits v. Cruthirds, 548 So.2d 1312 (Miss.1989). In that case, the maternal and paternal grandparents of a minor child sought custody after the father of the child killed the mother. The Chancellor awarded custody to the maternal grandparents, but did not terminate the father's parental rights. The Chancellor did find, however, that the father was morally unfit to have custody of the child because he showed no signs of rehabilitation, exhibited no remorse for his crime, and believed that he could make up for the absence of the child's mother with material goods. Id. at 1315. This Court affirmed that decision, finding specifically that the father had not abandoned his child, the necessary criterion to terminate parental rights in that case, since there had been no abuse or court ordered counseling. Id. at 1316. The Veselits case is easily distinguishable from the case at bar in that in Veselits, the father committed a crime against the child's mother, but did nothing physically abusive directly against the child.
¶ 26. In this case, the parent harmed the child and then failed to seek immediate medical attention for the child. The Family Court ordered counseling in the hope that the natural parents could rehabilitate themselves from their abusive conduct. Terminating parental rights cannot and will not be used as a punishment for the natural parents for failing to engage in "constructive" counseling. However, in light of the fact that the Family Court ordered counseling on the theory that the natural parents could rehabilitate themselves from their abusive conduct, the Family Court was not manifestly erroneous in terminating their parental rights for their failure to do so. Miss.Code Ann. § 93-15-103(3)(e)(ii) specifically states that parental rights may be terminated when failure to rehabilitate prevents return of the child to the home. The failure of the natural parents to acknowledge the abusive situation in this case can lend no comfort to a decision by the Family Court or this Court that such abuse will not continue should the child be returned to the home.

C. Miss.Code Ann. § 93-15-103(3)(f) Substantial erosion of parent/child relationship caused at least in part by the parents' abuse.
¶ 27. At trial, Judge Ward commented that this was the worst case of child abuse ever to pass before his bench. He found that the abuse caused a substantial erosion in the parent/child relationship. The Family Court further found that because A.N.A. had lived with her foster parents since September of 1993 and has had limited contact with her natural parents, A.N.A. should not be removed from her foster parents care. Testimony from Dr. Davidson, the Guardian Ad Litem, and the social worker in this case confirmed that A.N.A. bonded with her foster parents and considers them her parents. They further testified that it would be detrimental for A.N.A. to be removed from her foster parents care.
¶ 28. The natural parents argue that they should not be penalized for failing to maintain a bonded relationship with A.N.A. since they have been restricted by court order to only limited, supervised visitation. In other words, since the natural parents continuously sought and exercised visitation, they cannot be held responsible *338 for the erosion of the parent/child relationship.
¶ 29. There is no question that the Family Court correctly concluded that all the evidence indicates that A.N.A. should remain with her foster parents, who have provided her with a stable and loving environment. A finding of substantial erosion of the parent/child relationship necessarily involves a consideration of the relationship as it existed when the termination proceedings were initiated. At that time, the natural parents were exercising limited, supervised visitation. This Court has said that substantial erosion could be proved by showing a prolonged absence and lack of communication between the parent and child. Ainsworth v. Natural Father, 414 So.2d 417 (Miss.1982). A.N.A. has been separated from her natural parents for approximately seven years. In Vance v. Lincoln County Dep't of Pub. Welfare, 582 So.2d 414, 418 (Miss.1991), this Court held that there had been a substantial erosion of the parent/child relationship where the children were frightened by memories of a violent crime committed by their mother. The guardian ad litem noted in her testimony that A.N.A. had just begun the traumatic experience of questioning what exactly happened to her and why she has scars.
¶ 30. Paramount to any decision concerning the custody of a child is that child's best interest. The statute requires erosion of the relationship to result, in part, from the abuse of the parents. With respect to the Family Court's opinion, it is clear that the severe abuse by natural parents, not the presence of A.N.A.'s foster parents, prompted the decision to terminate parental rights. While it is true that evidence of the erosion of the natural parent/child relationship consists in part of the developing relationship between A.N.A. and her foster parents, the fact that foster parents care for A.N.A. today is a direct result of the abuse she suffered at the hands of her natural parents. The Family Court's decision that there had been a substantial erosion of the relationship between A.N.A. and her natural parents due at least in part to their abuse is supported by substantial evidence and cannot be said to be manifestly erroneous.

II. CUSTODY GIVEN TO PATERNAL GRANDPARENTS
¶ 31. Alternative to their assertion that parental rights should be terminated, the natural parents argue that custody of A.N.A. should have been given to her paternal grandparents, who have custody of the three other children. The natural parents point out that this Court has found that it is important for siblings be kept together whenever possible. Sparkman v. Sparkman, 441 So.2d 1361, 1362 (Miss. 1983) ("The Court shall in all cases attempt insofar as possible, to keep the children together in a family unit. It is well recognized that the love and affection of a brother and sister is important to them and to deprive them of the association ordinarily would not be in their best interest."); see also Carson v. Natchez Children's Home, 580 So.2d 1248 (Miss.1991); Mixon v. Bullard, 217 So.2d 28 (Miss. 1968). While unification of the family unit is a laudable goal, this case does not present the ordinary situation and the overriding concern must always be the best interest of the child.
¶ 32. Upon her release from the hospital, A.N.A. required medical care that her paternal grandparents could not provide. A.N.A. was given to the foster parents, in part, because they are both licensed, registered nurses capable of giving A.N.A. the continuous medical care that she needed at home. Through those trying times, A.N.A. bonded with the foster parents. She has lived in their home for almost seven years. A.N.A. is now 8 and a half years old. Testimony from the expert witness implies that it would do more harm than good for A.N.A. to be removed from this familiar atmosphere.
¶ 33. While there is a legal interest in maintaining relationships between siblings, and even grandparents, there is no indication *339 that will not occur in this case. Testimony at trial revealed that A.N.A.'s foster parents received counseling about the importance of allowing her to visit her natural siblings and grandparents. The foster parents indicated that they realized the long-term psychological advantage that A.N.A. would gain by maintaining her relationship with her extended natural family. There is no evidence that suggests A.N.A. will be unable to foster a genuine relationship with her siblings and grandparents. The record reflects that the best interests of A.N.A. are best served by allowing her to remain in her foster parents' care. This suggestion of error is without merit.

CONCLUSION
¶ 34. The judgment of the Harrison County Family Court is affirmed.
¶ 35. AFFIRMED.
McRAE, SMITH and MILLS, JJ., concur.
PRATHER C.J., concurs with separate written opinion joined by SMITH, J.
WALLER, J., dissents with separate written opinion joined by PITTMAN and BANKS, P.JJ., and COBB, J.
PRATHER, Chief Justice, Concurring.
¶ 36. Today, I join in Justice Diaz's majority opinion for the Court in which the Court upholds the trial court's termination of the parental rights of G.Q.A. and R.S.A. I write separately only to discuss the federal Adoption and Safe Families Act of 1997 ("ASFA"), Pub.L. No. 105-89, 111 Stat. 2115 (1997), which will significantly impact this area of the law.
¶ 37. As stated in the majority, Congress recently enacted ASFA in order to increase the safety of children. In pursuing that goal, ASFA provides that "reasonable efforts" to reunite children with their parents "shall not be required ... if a court of competent jurisdiction has determined that (i) the parent has subjected the child to aggravated circumstances (as defined in State law, which definition may include but need not be limited to abandonment, torture, chronic abuse, and sexual abuse)." 42 U.S.C.A. § 671(a)(15)(D)(i) (Supp.2000). Essentially, ASFA clarifies that a child need not be forced to remain in or be returned to an unsafe home and allows the States to place the safety and welfare of the child before the interests of abusive parents. While relevant to A.N.A.'s case, this law, by Congress' direction, did not take effect until November 19, 1997. Adoption and Safe Families Act of 1997, § 501 of Pub.L. No. 105-89. Since A.N.A., by and through her foster parents, filed the Petition to Terminate Parental Rights on February 28, 1997, ASFA is not applicable to this case. Nonetheless, ASFA, indeed, will significantly improve the lives of children in this State.
SMITH, J., joins this opinion.
WALLER, Justice, Dissenting.
¶ 38. I respectfully dissent from the decision to terminate parental rights, as there was no substantial evidence to warrant terminating the natural parents' visitation that had occurred for more than four years, apparently without incident.
¶ 39. A.N.A. was removed from the custody of the natural parents in July of 1993 as she should have been. The abuse was severe and a change of custody back to the natural parents is not appropriate. However, a petition to terminate parental rights was not filed until February 28, 1997, a time lapse of over four years. In the interim, the natural parents made every effort to comply with the requirements of the court and the DHS. The natural parents both attended counseling and obtained gainful employment and suitable living conditions. Most importantly, the natural parents sought and maintained visitation with A.N.A.[1] Indeed, they indicated a desire at the hearing and in their briefs *340 on appeal for more visitation. They expressed love and affection towards A.N.A. and a desire to see their relationship with their child continue.
¶ 40. There was no testimony that it would be detrimental to A.N.A. to continue having visitation with her natural parents. No testimony recounted abuse, attempts of abuse, or other untoward behavior towards A.N.A. at any time since the occurrence of the abusive incidents for which the natural parents rightfully lost custody. There was no testimony of a substantial erosion of the parent/child relationship, including a total lack of evidence of any extreme and deepseated antipathy by A.N.A. towards the parents. Miss.Code Ann. § 93-15-103(3)(f).
¶ 41. Neither was there testimony from the child nor any indication that the judge or the guardian ad litem had questioned the child about how she felt about her natural parents. While the child was of a tender age when the termination hearing occurred, she was of an age where she could begin to articulate her feelings on this subject. No person testified that A.N.A. would become extremely upset or emotional when brought to see the natural parents. There was no testimony from the foster parents that visitation with the natural parents caused fright or fear, anger, or any other demonstrable emotion by A.N.A. That type of testimony is not only helpful in evaluating whether there has been a substantial erosion of the parent/child relationship, it is essential.
¶ 42. Parental rights is an issue of fundamental constitutional law that should never be considered lightly or haphazardly. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); May v. Anderson, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953). Probably because of the seriousness of such action by a court, the Mississippi legislature has included specific language requiring alternatives to termination of parental rights, codified at Miss.Code Ann. § 93-15-103(4) (Supp. 1999):
Legal custody and guardianship by persons other than the parent as well as other permanent alternatives which end the supervision by the Department of Human Services should be considered as alternatives to the termination of parental rights, and these alternatives should be selected when, in the best interest of the child, parental contacts are desirable and it is possible to secure such placement without termination of parental rights.
¶ 43. Paramount to any decision concerning the custody of a child is that child's best interest.
¶ 44. I do not suggest that custody of A.N.A. be returned to the natural parents, but clearly there is some interest in allowing these parents, siblings (she has three), and this child to maintain a relationship, however limited. For that reason, I would remand this case to the trial court for a new hearing to address whether limited visitation has been or will be detrimental to the health and well-being of A.N.A., particularly in light of the record presently before this Court, which is totally devoid of such evidence. The court should also consider whether, at the time of the filing of the petition to terminate parental rights, a substantial erosion of the relationship between A.N.A. and her natural parents had occurred that would warrant termination of their parental rights.
¶ 45. I respectfully dissent.
PITTMAN and BANKS, P.JJ., and COBB, J., join this opinion.
NOTES
[1] The visitation was supervised at all times.