# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-CA-00532-SCT

*J.J.B.*

*v.*

*MONROE COUNTY DEPARTMENT OF CHILD PROTECTION SERVICES, BY MARCUS D. DAVENPORT, E.C.W., A.J.W. AND M.B.B., MINORS, BY AND THROUGH THEIR NEXT FRIEND, MARCUS D. DAVENPORT*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/06/2023 |
| TRIAL JUDGE: | HON. JACQUELINE ESTES MASK |
| TRIAL COURT ATTORNEYS: | LISA ANN KOON |
| | LINDSEY ETHERIDGE LAZINSKY |
| | ANGELA KELLY LENDERMAN |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: JENNIFER LOUISE MORGAN |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KRISTI DUNCAN KENNEDY |
| | LINDSEY ETHERIDGE LAZINSKY |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 01/16/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1. Jane's three young daughters had been in the custody of the Mississippi Department of Child Protection Services (CPS) for several years when CPS successfully petitioned to

terminate Jane's parental rights.[1]  Jane appeals the termination.  She argues the real reason the chancellor terminated her parental rights is because she is poor.  She reasons that because CPS did not remove her fourth child—fathered by a different man and born a year and a half after the girls had been taken into custody—then she cannot be unfit to parent.

¶2.     But the record shows Jane's actions toward her daughters differed greatly from the care she has provided her son.  Unlike her son, Jane had left her three girls with her disabled mother to live unsupervised with their cousins in a one-bedroom apartment—prompting CPS to take them into custody.  While her girls were in foster care, Jane failed to comply with both a service plan for reunification and a later agreed court order.  Specifically, Jane would not get a job that would generate income to support her girls.  And she abandoned a suitable apartment to live in a smaller apartment with her abusive boyfriend.  She also did not regularly visit her daughters.  Because the record supports the chancellor's findings, we affirm the chancellor's order terminating Jane's parental rights.

## Background Facts & Procedural History

### I.     CPS removed Jane's daughters from her custody.

¶3.     In December 2019, Jane's daughters were five, three, and twenty-two months old when they were removed from Jane's legal custody.  The three small children had been living in a one-bedroom apartment with Jane's wheelchair-bound, dialysis-dependent mother.  Jane's sister and her sister's three children also lived in the apartment.  Jane was reportedly

---

[1] Because this is a confidential case, we refer to the appellant by a pseudonym and decline to name her minor children.

on drugs and living on the street, having been kicked out of a different apartment in the same complex.

¶4.     Neighbors had reported to CPS that the children frequently ran in and out of the apartment unsupervised.  They also heard adults screaming at the children.  So CPS sent an investigator.  She observed Jane's two older girls outside by themselves. Inside the apartment, the conditions were dirty, cramped, and unsafe.  There was a knife on the table, an undrained bathtub holding water, and a baby crib full of pillows.  CPS deemed this an emergency situation and took Jane's three girls into its custody.

## II.     Jane failed to comply with the CPS service plan and agreed order.

¶5.     The next month, the youth court adjudicated the three children neglected.  CPS developed a service plan for Jane to work toward reunification with her daughters.  This plan included obtaining stable housing, "gainful employment to provide the basic needs for her children," and transportation.  Jane also agreed to drug screening and parenting classes.

¶6.     While Jane did get clean from drugs and completed parenting classes, she failed to substantially comply with the other requirements of employment, housing, and transportation. Jane's efforts to get a job were sporadic and short-lived.  She did initially obtain a three-bedroom subsidized apartment after she left rehab.  But she later abandoned that apartment to live in a smaller one with her boyfriend, who was prohibited from the apartment grounds after a reported domestic-violence incident.  Jane also failed to regularly communicate with the girls, and her visits with them were chaotic.

¶7. Due to Jane's noncompliance, the youth court found reunification was no longer in the girls' best interest. So the permanency plan was changed to adoption. CPS then petitioned to terminate Jane's parental rights.[2] Jane was appointed counsel under Mississippi Code Section 93-15-113 (Rev. 2021).

¶8. Between her initial appearance and first termination hearing, Jane gave birth to a fourth child, a son, fathered by her boyfriend.

¶9. The first termination hearing was continued by agreed court order. The agreed order had similar requirements to the service plan—with the added requirement that Jane was to have no contact with her allegedly abusive boyfriend except contact related to their minor child. But as with the service plan, Jane failed to substantially comply.

### III. The chancery court held a termination hearing.

¶10. Consequently, in January 2023, the chancery court conducted a hearing to determine if Jane's parental rights should be terminated.

¶11. Two CPS workers assigned to Jane's case testified. They explained the reasons why the girls had been removed to CPS custody. They also discussed Jane's noncompliance with the service plan and agreed order. Specifically, over the course of the three years between losing custody and the termination hearing, Jane—though clean from drugs—never obtained

---

[2] The petition also sought termination of the parental rights of the legal father of the older two girls, the biological father of the second girl, and the putative father of the youngest girl. One father responded to the petition. And another father appeared at the initial hearing. Those two fathers also appeared and testified at the termination hearing. But neither father appealed the termination of his parental rights.

a job sufficient to provide for the girls' basic needs. She also failed to maintain a suitable place for her girls to live. And she did not procure suitable transportation.

¶12. Further, she missed many of her scheduled visits with her daughters. And, according to one of the CPS workers, the visits she did attend were often chaotic, with Jane bringing extra family members. The girls did know Jane was their mother and seemed happy to see her, though the foster parents reported that behavioral issues resulted from the visits. The other CPS worker testified she observed no bond between Jane and her girls. She attributed this to how little Jane communicated with and saw them.

¶13. Finally, Jane did not comply with the agreed order's directive to have limited contact with her son's father. Instead, she moved into his apartment.

¶14. CPS did not, however, see a reason to remove Jane's son from her custody.

¶15. Jane also testified. She discussed rehab and how she had been clean ever since. She also testified about her efforts to get a job. She attributed her lack of success to her being able to obtain only low-wage jobs, conflicts with coworkers, pregnancy, having to care for her infant son, and lack of transportation. She had similar excuses for not visiting her daughters. She claimed maintenance issues were the impetus for her temporarily leaving her three-bedroom apartment. And the complex—mistakenly thinking she had moved out—threw away her belongings and rented the apartment to someone else. Jane also downplayed the reported domestic-violence incident with her boyfriend, claiming it was just a "tussle." And she testified she believed he was clean from drugs.

5

¶16.     When asked how she intended to provide for her daughters, Jane said her boyfriend had helped take care of her son and had let her use his car.  Jane claimed that she just needed more time, though her own court-appointed attorney admitted Jane kept saying that she just wanted to be a stay-at-home mom.

¶17.     At the hearing's conclusion, the girls' appointed Guardian Ad Litem (GAL) gave her oral recommendation.  Based on her investigation, she recommended Jane's parental rights be terminated.  She recommended the girls remain with their foster family, who indicated their willingness to adopt all three girls.  According to the GAL's report, "it is obvious that [Jane was] unwilling to provide for the basic needs" of the three girls, which is a statutory ground for termination. The GAL reached this conclusion based on Jane's lack of employment income, stable housing, and transportation, as well as Jane's abusive relationship with her boyfriend "and the domestic violence resulting from that relationship."

### IV.     The chancery court terminated Jane's parental rights.

¶18.     Consistent with the GAL's recommendation, the chancellor terminated Jane's parental rights.  The chancellor found all four statutory requisites in Mississippi Code Section 93-15-115 (Rev. 2021) had been met by clear and convincing evidence.  Section 93-15-115 governs involuntary termination when children are in CPS custody and when reasonable efforts for reunification are required.  *Id.*

¶19.     One of the four requirements is that "[t]ermination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome based on one or more of the grounds set out

in Section 93-15-119 or 93-15-121." Miss. Code Ann. § 93-1-115(d). And the chancellor found clear and convincing evidence of four grounds—namely (1) abandonment, desertion, or unfitness; (2) unwillingness to provide reasonably necessary food, clothing, shelter, or medical care; (3) failure to exercise reasonable visitation; and (4) causing substantial erosion of the parent-child relationship. Miss. Code Ann. §§ 93-15-119(l)(a)(i), -121(d), -121(e), -121(f) (Rev. 2021).

¶20. The chancellor further found that termination of Jane's parental rights was in the best interest of her three daughters. The termination was necessary "so that a permanent and stable plan for the future of the Minor Petitioners may be made and so that the Minor Petitioners will be eligible for adoption." Jane timely appealed the termination order. She was granted leave to proceed with her appeal in forma pauperis with appointed appellate counsel.

**Discussion**

¶21. We review the chancellor's termination decision under the "clearly erroneous/manifest error standard." *G.Q.A. v. Harrison Cnty. Dep't of Hum. Res.*, 771 So. 2d 331, 335 (Miss. 2000). If there is substantial evidence to support the chancellor's findings, we will not disturb them, even though "we might have found otherwise as an original matter." *Id.* (citing *Hale v. Bradley (In re Est. of Harris)*, 539 So. 2d 1040, 1043 (Miss. 1989)). With this deferential standard in mind, we affirm the chancellor's termination decision.

¶22. Jane challenges the chancellor's finding that clear and convincing evidence supported terminating her parental rights. Specifically, Jane suggests that her "lack of money" was the

true reason for the termination. Jane argues that, because CPS never removed her son from her custody, she was not unfit to parent *him*. So she could not be unfit to parent her three older daughters. In her view, it was only her relative poverty compared to the girls' foster parents that cost her parental rights.

¶23. These are serious accusations. This Court has long held that, when determining whether to remove a child from parental custody, the question is not "whether a wealthy stranger can give to the child more worldly advantages than an indigent parent." *Moore v. Christian*, 56 Miss 408, 411 (1879). "This would be to make poverty a crime, and to punish it by the bitterest of penalties." *Id.* Further, because there is a fundamental liberty interest to care for one's children, grounds for termination require clear and convincing evidence. *Chism v. Bright*, 152 So. 3d 318, 322 (Miss. 2014) (citing *Santosky v. Kramer*, 455 U.S. 745, 754, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)); Miss. Code Ann. §§ 93-15-119, -121 (Rev. 2021). And poverty is not an enumerated statutory grounds for termination. Miss. Code Ann. §§ 93-15-119 & -121.

¶24. But Jane's accusations are unfounded. She ignores the drastically different circumstances CPS found her daughters in versus her son. Because of her prior drug addiction, Jane did not physically care for her three girls. This prompted CPS to take them into custody. By contrast, Jane was sober and caring for her son when the GAL interviewed her. Still, in the three years preceding termination, Jane proved unwilling to obtain sufficient income, housing, and transportation for her girls to return to her custody. And Jane has been receiving assistance from her son's father and his family to care for her son—assistance not

provided by the girls' paternal relatives. Finally, while Jane has consistently cared for her son, she has sporadically and inconsistently communicated with and visited her daughters.

¶25. We commend Jane's efforts to get clean and be a fit mother to her son. But her actions toward her son do not alter her actions—or rather inactions—toward her daughters and the resulting consequences. Jane's lack of effort to care for and visit her girls—and not her lack of money—was the clear and express reason the chancellor terminated her parental rights. *See* **Hall v. Jackson Cnty. Dep't of Hum. Servs. (In re Int. of B.A.H.)**, 225 So. 3d 1220, 1242 (Miss. Ct. App. 2016) (affirming termination when, due to the mother's "own choices"—including her failure to comply with the service plan—"she was unable to regain custody of her children within a reasonable period of time").

¶26. "[O]nly one of the enumerated grounds [in Section 93-15-119 or -121] need[s] to be satisfied in order to justify terminating a natural parent's rights." **W.A.S. v. A.L.G.**, 949 So. 2d 31, 35 (Miss. 2007). And here, the chancellor found four statutory grounds in Sections 93-15-119 and -121 to terminate Jane's parental rights.

¶27. First, the chancellor found Jane had abandoned or deserted her girls or was otherwise unfit to raise them. Miss. Code Ann. § 93-15-119(1)(a)(i). Jane asserts she cannot be unfit because CPS did not later remove her son from her custody. But as already discussed, before her son was born, Jane had essentially deserted her three other children. She had left them in her disabled mother's care for extended periods of time in an unsupervised and unsafe environment. And while Jane has cared for her son, she has proved unwilling to cultivate a safe, suitable home for her three girls.

9

¶28. Second, the chancellor found Jane was unwilling to provide reasonably necessary food, clothing, shelter, or medical care for her daughters. Miss. Code Ann. § 93-15-121(d). Jane insists that there is a difference between being unwilling and unable. She claims she *wants* to provide for her girls—she just needs help. But the GAL and the chancellor disagreed. Both found Jane's failures to comply with the service plan and agreed court order stemmed from her *unwillingness* to find a suitable job and housing for her girls. We agree with CPS that Jane's actions spoke louder than her words. Jane may still want to have parental rights over her daughters. But for three years, she failed to act on that desire by complying with the service plan or agreed order. *See Adams v. Powe*, 469 So. 2d 76, 78-79 (Miss. 1985) (terminating parental rights based on evidence that, despite being "given considerable opportunity and warning that they must change their lifestyle," the parents refused to "provid[e] their children with the most basic necessities for a healthy life which were well within the [parents'] capabilities if they were so inclined").

¶29. Third, the chancellor found Jane failed to exercise reasonable visitation or communication with her daughters. Miss. Code Ann. § 93-15-121(e). This finding is clearly supported by the CPS workers' testimony. And Jane herself admitted she missed visits—though she had multiple excuses for doing so. Significantly, Jane visited with the girls just once during the seven-month span between her entering the agreed order and the termination hearing. And from October 2022 to December 2022, Jane had zero contact with CPS. *See In re S.T.M.M.*, 942 So. 2d 266, 270 (Miss. Ct. App. 2006) (finding grounds to

10

terminate based on mother's sporadic and infrequent visitation with her children, despite being required to maintain regular visitation by her reunification service plan).

¶30. Finally, the chancellor found Jane's abusive or neglectful conduct has caused, at least in part, an extreme and deep-seated antipathy by the girls toward her or some other substantial erosion of the parent-child relationship. Miss. Code Ann. § 93-15-121(f). This is perhaps a closer call than the other grounds. These facts are not as extreme as in many cases when parental rights were terminated on this ground. *See In re V.M.S.*, 938 So. 2d 829, 836 (Miss. 2006) (discussing the typical factual circumstances in which a extreme antipathy or substantial erosion of the child-parent relationship was found—such as physical abuse, prolonged incarceration tantamount to abandonment, and continued contact with the child's abuser). But evidence showed that while the girls were in CPS custody for three years, their relationship with their mother had deteriorated. One CPS worker testified there appeared to be no bond between Jane and her daughters. The girls did not really want to visit Jane. And Jane herself admitted she did not know how to interact with her girls. The foster parents also reported behavioral issues after the girls' visits. *See R.B. v. Winston Cnty. Dep't of Child Prot. Servs.*, 291 So. 3d 1116, 1124 (Miss. Ct. App. 2019) (affirming the chancellor's finding of a substantial erosion of the parent-child relationship based on "no bond" between the child and her parents, inconsistent and infrequent contact between the parents and child, and the visits' adverse affects on the child); *In re B.A.H.*, 225 So. 3d at 1242 (affirming termination in part because no observable bond existed between the mother

11

and child—instead, "[t]heir interactions were described as akin to a babysitter playing with children").

¶31.   From this evidence, we cannot say the chancellor manifestly erred by finding this fourth ground also supported termination.  But even if she did, the termination should still be affirmed.  Again, clear and convincing evidence of *just one* of these four grounds is sufficient.  *W.A.S.*, 949 So. 2d at 35.  And the other three grounds are clearly supported.

¶32.   Because substantial evidence—other than poverty—exists to support the chancellor's decision that termination of Jane's parental rights was in the girls' best interest, we affirm.

¶33.   **AFFIRMED.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., CHAMBERLIN, ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**