# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CP-00995-COA

**A.M.Q.**                                                                          **APPELLANT**

**v.**

**FORREST COUNTY DEPARTMENT OF CHILD**                    **APPELLEES**
**PROTECTION SERVICES, BY ANDREA A.**
**SANDERS, M.A.R., AND I.V.R., MINORS, BY**
**AND THROUGH THEIR NEXT FRIEND,**
**ANDREA A. SANDERS**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/25/2024 |
| TRIAL JUDGE: | HON. CAROL JONES RUSSELL |
| COURT FROM WHICH APPEALED: | FORREST COUNTY YOUTH COURT |
| ATTORNEY FOR APPELLANT: | A.M.Q. (PRO SE) |
| ATTORNEYS FOR APPELLEES: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KRISTI DUNCAN KENNEDY |
| | CONDREA MARIE COLLINS |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 03/10/2026 |
| MOTION FOR REHEARING FILED: | |

### BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.

### WESTBROOKS, J., FOR THE COURT:

¶1.    A.M.Q. appeals the judgment of the Youth Court of Forrest County terminating her parental rights to her two children, M.R. and I.R.[1] After a careful review of the record, we find sufficient credible evidence supports the court's order terminating A.M.Q.'s parental rights.

### FACTS AND PROCEEDINGS

---

[1] We use initials to protect the minors' privacy.

¶2.     M.R. was born in 2007, and I.R. was born in 2015.[2] In September 2022, M.R. and I.R. were taken into the custody of Forrest County Child Protection Services (CPS) following recurring reports of domestic violence in the home and suicidal threats made by A.M.Q.[3] An investigation was instigated when the children disclosed that they were afraid to go home from school. The evening before, I.R., who was age seven at the time, knocked on a neighbor's window around bedtime and told them that she was scared. According to M.R.'s statements to CPS, A.M.Q. punched M.R. and told her that she was going to kill her. A.M.Q. also said that she wanted to kill herself via an overdose and that if she never woke up, it would be M.R.'s fault. M.R. told CPS that when angry at her, A.M.Q. would scream and threaten her, saying that she would kill either M.R. or herself. A.M.Q. also disclosed to her aunt that she was suicidal.

¶3.     A.M.Q. had been evicted from her previous residence and was in the process of being evicted from her current residence because of her violent boyfriend and, according to A.M.Q., having more dogs than was allowed. A.M.Q.'s landlord told CPS that I.R. had been left outside of the house "quite a few times." CPS recommended acute mental-health treatment for A.M.Q. However, she declined to seek inpatient treatment for her mental

_____

[2] M.R.'s father voluntarily surrendered his parental rights and joined the proceedings as a petitioner. I.R.'s father's parental rights were terminated at the same time as A.M.Q.'s. He did not contest the termination.

[3] The police had been called multiple times previously in response to domestic violence reports in A.M.Q.'s household. Two months previously, police responded to a domestic-violence call related to a fight between A.M.Q. and her ex-fiancé that had occurred in front of M.R. A.M.Q. asserted that she struck her ex-fiancé in the face with a set of car keys after he pushed her down, and that he threw a duffel bag at M.R. The ex-fiancé asserted that A.M.Q. began pushing him first and that she had been drinking vodka all day.

2

health.[4] A drug screen showed a positive result for buprenorphine.

¶4. The court entered an emergency order placing M.R. and I.R. in the custody of Forrest County CPS, finding that the children's custodian "cannot or will not supply adequate food, shelter, or supervision" and that the "home environment or the people in [the] home pose an immediate danger" to the children. The court noted that the mother refused to access mental health services and that the children were fearful of being in the home. The children were placed with a foster care family. A.M.Q. entered into a family service plan with CPS in October 2022. The plan included an agreement for A.M.Q. to obtain and maintain stable housing, submit to twice-monthly drug screens and obtain negative results, attend weekly NA/AA meetings, obtain and maintain transportation, obtain a psychological evaluation, obtain employment and a steady income, maintain visitation with the children, maintain contact with the caseworker, and attend and complete parenting classes.

¶5. In February 2023, the Forrest County Youth Court adjudicated M.R. and I.R. as neglected children with a permanency plan of reunification and a concurrent plan of durable legal custody. In the adjudication order, the court determined that "the mother is unable or unwilling to provide for the basic needs of the child due to her mental health conditions and unstable living conditions. Further, the mother has allegedly been involved in a domestically violent relationship." In May 2023, the court paused A.M.Q.'s visitation with her children due to A.M.Q.'s pattern of missing visits and the negative effect this inconsistency had on the children. According to the Guardian ad Litem (GAL) report, I.R. would "have very

---

[4] She declined inpatient treatment because no one could take care of her dogs.

extreme adverse reactions when her mother would miss visitations . . . . She was constantly worried her mother was harmed or hurt and would ask regularly if anyone knew if she was okay." Her extreme reactions and questions stopped when the visitation schedule was paused. M.R. also suffered mental health struggles during this time, including acute treatment after incidents of cutting and thoughts of self-harm.

¶6.     In July 2023, the court conducted a permanency hearing and changed the permanency plan to adoption, finding that the goal of reunification was no longer appropriate and not in the best interest of the children. The court's order found that CPS "has made reasonable efforts to diligently assist the parent(s) toward reunification over a reasonable period of time, but that the parent(s) have failed to substantially comply with the service plan." The order also found that "Forrest County CPS has made multiple referrals to assist the mother with inpatient mental health." The court conducted a hearing on the termination of parental rights in June 2024. At the time, M.R. was sixteen years old, and I.R. was nine years old. The court heard from multiple witnesses, including the children's therapists, M.R., a CPS caseworker, A.M.Q.'s pastor, and A.M.Q. At the time of the hearing, A.M.Q. had not had visitation with either child for more than a year. A.M.Q. did not attend the permanency hearing. When asked at the termination hearing why she did not attend, she stated that she was in rehab. However, she did not start her three-month rehab program until August 2023.

¶7.     Therapist Connie Anderson testified that I.R. struggled with food issues. When I.R. went into foster care, she did not want to eat because she was afraid of what might be in the food. I.R. was taken to the emergency room for treatment for dehydration due to her refusal

to eat or drink. It emerged that I.R. believed that A.M.Q. had been putting something in I.R.'s food to make her go to sleep. I.R.'s food issues improved when her foster parents had her watch the food preparation process, but food issues continued to be a significant topic in therapy. Anderson directly asked I.R. if she would want to live with her mom again, and she said no. M.R. disclosed to Anderson that they frequently did not have enough food to eat. M.R. was often responsible for I.R. and watched out for her in light of A.M.Q.'s drug use, different boyfriends, and the general instability of the home. M.R. also confirmed that I.R. believed that A.M.Q. put something in her food to make her go to sleep. Anderson did not recommend that the children go back to their mother, and Anderson expressed her opinion that M.R. had antipathy or an aversion to her relationship with her mother.

¶8.    I.R.'s current therapist, Katherine Mayet, testified that I.R. disclosed that there was violence and drug use in the home. I.R. said that A.M.Q. was violent toward M.R. When asked to tell stories about her family, I.R. consistently chose to talk about her foster family. When Mayet was asked if she would recommend I.R. going back to her mother, Mayet said that it would "take years of repair before they would have a stable environment for one another. And I think just given how well she's doing in her current foster home that she could potentially regress in her treatment." "It would be detrimental to her treatment if that was broken and she had to be removed from this current family."[5]

---

[5] The siblings were initially placed together with a foster family who already knew the siblings and whose child is M.R.'s close friend. However, after receiving acute care for behavioral issues, I.R. was placed with a different licensed therapeutic foster home. I.R.'s current therapist testified that, in her opinion, I.R.'s emergent behavioral issues were indicative of her finally feeling safe enough to allow the trauma she experienced in A.M.Q.'s household to rise to the surface.

¶9.     CPS caseworker J.B. Slider testified. Slider had been involved in the case since November 2022. Slider testified that the agency made many referrals for resources, such as mental health services and housing, but that it was common to not hear from A.M.Q. and to not be able to get in touch with her. Additionally, at times when specific plans were made to get her help for mental health treatment or protection from domestic violence, CPS was unable to locate her. She did not stay in one place very long. In December 2022, A.M.Q. tested positive for amphetamines, THC, and buprenorphine. In March 2023, A.M.Q. tested positive for amphetamine at a level of 18,774 with a cutoff of 500 and methamphetamine at a level of 146,035 with a cutoff of 500. In June 2023, A.M.Q. tested positive for amphetamines at a level of 9,673 with a cutoff of 500 and positive for methamphetamine at a level of 56,225 with a cutoff of 500. In January 2024, A.M.Q. tested positive for amphetamine at a level of 1,333 with a cutoff of 500. In March 2024, she tested positive for amphetamines at a level of 2,296 with a cutoff of 500. In May 2024, A.M.Q. tested positive for amphetamines at a level of 2,258 with a cutoff of 500. A.M.Q. has taken prescribed ADHD medication since 2019. Slider testified that if taking only her prescription and as prescribed, the agency would expect her drug testing results to be straight across the board rather than showing huge swings above the cut-off.

¶10.     M.R. testified that there was a lot of anger and neglect in the home. She stated that A.M.Q. claimed to have been diagnosed with bipolar disorder, depression, and anxiety. M.R. testified that she had a good home environment with her foster parents and did not want to move back in with A.M.Q.

¶11.   A.M.Q. testified. She represented that at the time of the termination hearing she was in compliance with the family service plan. At the time of the hearing, she had been in an apartment suitable for children for two months and had a car. Her current vehicle was a recent gift from her recovery community after the vehicle she purchased was repossessed. She had recently started full-time employment with Pinebelt Mental Healthcare Resources, working with individuals in recovery.[6] She completed a three-month rehabilitation program in the fall of 2023.[7] According to A.M.Q., the program was to recover from alcohol abuse and the trauma of her abusive relationship with her boyfriend.

¶12.   A.M.Q. denied that she had ever struggled with a methamphetamine addiction. She acknowledged taking crystal meth on one occasion after her children had been taken away, but she represented that was the only time she had ever done that drug. When asked about a March 2023 drug screen that showed a methamphetamine level of 146,035 with a cutoff of 500, she suggested that the positive test was the result of her sharing a living situation with someone who was using and stated, "[L]ittle did I know that with even being in the area, it can sink into your hair." She denied that she had ever been diagnosed with bipolar disorder.[8]

¶13.   The court-appointed GAL attended the termination hearing and subsequently filed a

---

[6] In her previous career, A.M.Q. worked for a primary care doctor as a certified medical assistant.

[7] A.M.Q.'s current pastor, whose ministry focuses on recovery support, testified that A.M.Q. has been consistently attending recovery meetings and has been active in the recovery community.

[8] She also testified, "I quit taking my anxiety and depression medication . . . because God is my natural healer." However, she continued to take her ADHD medication.

report recommending that A.M.Q.'s parental rights be terminated. In the opinion of the GAL, A.M.Q. is "incapable of parenting [her] children and [her] children deserve permanency." The report emphasized the violent environment of A.M.Q.'s household, including her repeated threats of suicide, and that there "was no aspect of the service agreement completed prior to the agency changing the plan to one of termination." Further, the GAL expressed her concern that A.M.Q.'s sobriety, suitable housing, and transportation had not been in place long enough prior to the termination hearing to indicate the necessary stability to warrant postponing the permanency plan. In the GAL's opinion, in the two years since the children went into CPS custody, A.M.Q. lacked the necessary stability and accountability to achieve reunification. The GAL also noted that A.M.Q. has "never been able to admit that she had a problem with any form of drug usage although there were two different hair follicle drug screens and instant drug screens between a 6 month period that showed levels of Methamphetamine anywhere between 50,000 and 150,000 with a cut off of 500."

¶14. The court entered an order terminating A.M.Q.'s parental rights in July 2024. The court determined that reunification was not desirable toward obtaining a satisfactory permanency outcome and found multiple statutory grounds for termination, including a finding that A.M.Q. was unable or unwilling to provide reasonably necessary food, clothing, shelter, or medical care, warranting termination of parental rights under Mississippi Code Annotated section 93-15-121(d) (Rev. 2021). The court also found that A.M.Q.'s abusive or neglectful conduct has caused a substantial erosion of the parent/child relationship under section 93-15-121(f). Additionally, the court found under Mississippi Code Annotated

8

section 93-15-119(1)(a)(i) (Rev. 2021) that A.M.Q. had engaged in conduct constituting abandonment or desertion, or that she was mentally, morally, or otherwise unfit to raise the children.

¶15.    A.M.Q. now appeals pro se.

## STANDARD OF REVIEW

¶16.    "In reviewing a youth court's decision to terminate parental rights, we are limited by the clearly erroneous/manifest error standard of review." *Bullock v. Miss. Dept. of Child Prot. Servs.*, 343 So. 3d 1079, 1085 (¶21) (Miss. Ct. App. 2022) (citing *In re G.Q.A. v. Harrison Cnty. Dep't of Hum. Servs.*, 771 So. 2d 331, 334-35 (¶14) (Miss. 2000)); *see also* Miss. Code Ann. § 93-15-115 (Rev. 2021). "If there is substantial evidence to support the chancellor's findings, we will not disturb them, even though 'we might have found otherwise as an original matter.'" *J.J.B. v. Monroe Cnty. Dep't of Child Prot. Servs.*, 400 So. 3d 403, 408 (¶21) (Miss. 2025) (quoting *G.Q.A.*, 771 So. 2d at 334-35 (¶14)).

## DISCUSSION

¶17.    Mississippi Code Annotated section 93-15-121 enumerates standards that "if established by clear and convincing evidence, may be grounds for termination of the parent's parental rights if reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome." Section 93-15-121(d) permits termination if "[t]he parent is unwilling to provide reasonably necessary food, clothing, shelter, or medical care for the child[.]" Miss. Code Ann. § 93-15-121(d).

¶18.    At the time the two children were taken into CPS custody, A.M.Q. was in the middle

of a second eviction related to the presence of a violent boyfriend and drug use. The children witnessed violence and did not feel safe in the home. After the children were taken into CPS's custody, A.M.Q.'s living situation was unpredictable. CPS was frequently unable to locate or contact her. At one point, she texted a CPS worker and stated that she was living in a friend's shed to escape her abusive ex-boyfriend. She lived briefly in the house of supporters in her recovery community, but that living situation was not suitable for her children to join her.

¶19. M.R. and I.R. went into CPS custody in September 2022. Significantly, A.M.Q. did not make any progress toward complying with the family service plan until after the permanency plan was changed to adoption in July 2023. This included a failure to make progress to obtain and maintain stable housing, submit to twice-monthly drug screens and obtain negative results, attend weekly NA/AA meetings, obtain and maintain transportation, obtain a psychological evaluation, obtain employment and a steady income, maintain visitation with the children, maintain contact with the caseworker, and attend and complete parenting classes.

¶20. At the time of the termination hearing in June 2024, A.M.Q. represented that she was in compliance with the family service plan, including that she had a stable job, entered into a lease two months prior for an apartment that would be suitable for children, and had recently been gifted a vehicle. However, as the GAL and the CPS worker discussed at the hearing, the progress made immediately prior to the TPR hearing does not show that A.M.Q. can consistently maintain stability warranting a postponement of the permanency plan.

¶21. The testimony from M.R., as well as from the two therapists and CPS worker, supports that the household struggled with food issues. According to the testimony at the hearing, in addition to often not having enough food to eat, the younger child was afraid that her food had been drugged to the point that she initially refused to eat or drink when taken into foster care. After careful review of the record, we determine that substantial evidence was presented supporting the court's determination that A.M.Q. is unwilling to provide reasonably necessary food, clothing, shelter, or medical care for the child under a clear-and-convincing standard.

¶22. "Only one statutory ground is needed for termination of parental rights." *Bullock*, 343 So. 3d at 1086 (¶22). The court found additional grounds under section 93-15-121(f) and section 93-15-119(1)(a)(i). The evidence supported that there "was a lot of anger and neglect" in the household. A.M.Q. was directly violent to M.R. Further, A.M.Q. threatened to kill herself and said that M.R. would be to blame if that happened. M.R. testified at the termination hearing that she did not want to live with her mother again. At the time of the termination hearing, A.M.Q. had not seen either child in more than a year, and the visitations had stopped because of A.M.Q.'s sporadic attendance at the scheduled visitations. I.R. stopped asking about her mother after the visitations stopped. Additionally, I.R.'s behavioral health concerns have stabilized with her current adoptive-foster placement; she is focusing on "food issues" in therapy, and according to her therapist, "it would take years of repair" to re-establish a stable environment with A.M.Q. I.R. also directly indicated to her therapist that she did not want to return to live with her mother.

¶23. On review of the record, we determine that substantial evidence supported the court's determination that A.M.Q.'s abusive or neglectful conduct resulted in a substantial erosion of the relationship between parent and child, and that A.M.Q. was mentally, morally, or otherwise unfit to raise the minor petitioners.

## CONCLUSION

¶24. Substantial evidence supported the Youth Court's determination that three independent statutory grounds exist for terminating A.M.Q.'s parental rights. We therefore affirm the judgment of the youth court.

¶25. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**