# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-CA-00138-SCT

*X.G.C.*

*v.*

*JACKSON COUNTY DEPARTMENT OF CHILD PROTECTION SERVICES, BY MARCUS D. DAVENPORT, AND V.I.C., A MINOR, BY AND THROUGH HER NEXT FRIEND, MARCUS D. DAVENPORT*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/03/2023 |
| TRIAL JUDGE: | HON. ROBERT KEITH MILLER |
| TRIAL COURT ATTORNEYS: | LANIE ROUSSEL |
| | KATHLEEN SHORKEY COOK |
| | WILLIAM B. BEDWELL |
| | CHARLES ERIC MALOUF |
| | V. DENISE LEE |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY YOUTH COURT |
| ATTORNEYS FOR APPELLANT: | MATTHEW S. LOTT |
| | WILLIAM B. BEDWELL |
| ATTORNEYS FOR APPELLEES: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KRISTI D. KENNEDY |
| | LANIE ROUSSEL |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 01/23/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     X.G.C.[1] appeals the termination of his parental rights. He argues that the statutory

---

[1]To protect the identity of the parties, we use X.G.C. to refer to the father and V.I.C. to refer to the minor child.

requirements for Mississippi Code Section 93-15-115 (Rev. 2021) and Mississippi Code Section 93-15-119 (Rev. 2021) were not satisfied. We find that the record supports the court's findings and that all statutory requirements were met. We affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. V.I.C. was born in late December 2019. On January 13, 2020, three weeks after V.I.C. was born, she was taken to the hospital by her parents for a swollen and bruised face. The parents said that the injury was the result of an accidental elbow strike that occurred while the child was sleeping in the bed with them, i.e., co-sleeping. The parents were counseled about the dangers of co-sleeping, and V.I.C. remained in their custody. In early February 2020, when the child was eight weeks old, she was taken to the hospital for breathing issues and a bruise on her left cheek that covered most of the left side of the face. Upon arriving at the hospital, the doctors determined that V.I.C. was in critical condition due to a subdural hematoma. V.I.C. was life-flighted to Ochsner Children's Hospital in Louisiana. Doctors there opined that the injuries were consistent with shaken baby syndrome.

¶3. On February 13, 2020, an emergency custody order was entered removing the child from the custody of the parents and placing the child in the custody of the Jackson County Department of Child Protection Services (JCCPS). The emergency custody order stated:

> IT IS ORDERED AND ADJUDGED that the effect of the continuation of [the child's] residence within his/her own home would be contrary to the welfare of [the child]. . . . [The child] has suffered non-accidental physical injury which legal custodian(s) cannot adequately explain. The Court finds, [the child] has sustained what is possibly non accidental injury necessitating hospitalization; the parent/caretaker is unable to provide a possible source of

2

> this injury . . . the placement of [the child] with [JCCPS] is in the best interests of [the child] and there is no alternative to placing [him/her] in the custody of [JCCPS] at this time.
>
> . . . .
>
> [T]he [c]ourt hereby orders that reasonable efforts be made towards reunification of [the child] with his/her family.

Shortly after the issuance of this order, the youth court held a shelter hearing in which it entered another order reasserting that it was in the best interest of the child for custody to remain with JCCPS and ordering JCCPS "to continue to make reasonable efforts towards the reunification of [the child] with his/her family."

¶4. On March 2, 2020, the State filed a petition in the Youth Court of Jackson County, Mississippi, asking that the child be declared an abused child pursuant to Mississippi Code Section 43-21-105(m) (Rev. 2023). After conducting an evidentiary hearing, the youth court granted the petition. On September 21, 2020, the youth court entered two orders: (1) a disposition order and (2) a permanency order. In the disposition order, the court ruled that reunification with a parent was the permanency plan and that custody with a relative was the concurrent plan. The court again ordered JCCPS to make reasonable efforts toward achieving reunification.

¶5. Accordingly, on September 21, 2020, a service plan with X.G.C. and JCCPS was created to achieve reunification. The plan stated that the minor was to have a ninety-day in-home trial placement with the father and grandmother once the father's home was ready. The requirements of the service plan were as follows: provide a safe, stable, drug-and-violence-

3

free home for the minor; submit to a psychological evaluation and follow recommendations; enroll and complete age appropriate parenting classes approved by the JCCPS; obtain and maintain employment and housing; maintain visitation with the child as approved by JCCPS; maintain contact with JCCPS; obtain suitable transportation and obtain driver's license and insurance; and provide proof of enrollment and completion of each task in a timely manner to JCCPS.

¶6.     On or around October 30, 2020, the ninety-day in-home trial placement began. No issues occurred during the in-home trial placement until January 2021. On or around January 6, 2021, the father noticed that V.I.C. was suffering a "little pain" in the child's arm. He testified that the child was given over-the-counter medicine, i.e., ibuprofen, to treat the injury. X.G.C. also informed the child's daycare center, Head Start Daycare (Head Start), and the child's babysitter that the child's arm appeared to be hurt. After some time had passed, the staff of the daycare center informed the father that V.I.C.'s arm was not improving and urged him to take her to a doctor.

¶7.     X.G.C. took V.I.C. to the emergency room regarding her arm pain. At the hospital, it was discovered that the child had a three-point bending fracture, i.e., a transverse fracture, to her right arm. There was evidence that the injury had already begun to heal. The father said that he was not aware of how the child's arm became injured, but he speculated that the injury could have been the result of either co-sleeping or the child's arm having gotten stuck in the railing of a pull-out couch. Because this was V.I.C.'s third injury while in the father's

4

care and due to his lack of explanation of the cause of the injury, the child was removed from the father's care and placed in a foster home on January 13, 2021.

¶8. After the child was removed from the father's care, the youth court held another permanency hearing. During the hearing, JCCPS argued that the permanency plan should be changed from reunification to termination of the father's parental rights. It asserted that the change was warranted because of the number of times the child had been injured in a short period of time, and it did not believe the father was being honest about the cause of the child's injuries. On February 8, 2021, the youth court entered a permanency order, changing the permanency plan to termination of the father's parental rights. From the bench, the youth court judge explained his ruling, stating:

> [T]he [c]ourt is going to find that reasonable efforts have been made towards a permanent plan that was reunification and a concurrent plan of custody with a relative.
>
> I'm going to find that due to the aggravated circumstances of this case, this is just a whole lot—and Ms. Lee is right. I have seen this before in a four-year old little boy that I placed back with his mother; was deceased from a brutal beating, which we never found out who did it, within a month later. And the four-year-old died, and the [c]ourt is cautious because of that.

The February 8, 2021, permanency order stated:

> [T]his [c]ourt finds that the permanency plan of REUNIFICATION WITH A PARENT OR PRIMARY CARETAKER adopted on 09/21/2020 is no longer appropriate and not in the best interest of [the child], that the permanency plan of TPR/ADOPTION is appropriate and in the best interest of [the child] and that the concurrent plan of CUSTODY WITH A RELATIVE is appropriate and in the best interest of [the child].
>
> IT IS THEREFORE ORDERED AND ADJUDGED that the permanency plan

5

of TPR/ADOPTION be and hereby is adopted . . . and [JCCPS] be and hereby is ordered to make reasonable efforts to achieve the permanency plan of TPR/ADOPTION and the concurrent plan[.]

Over the course of approximately a year, the youth court conducted three separate permanency hearings in which it determined consistently that JCCPS was required to make reasonable efforts to achieve the newly adopted permanency and concurrent plans and that the permanency plan of termination of parental rights was appropriate.

¶9.    On November 16, 2021, JCCPS filed in the Jackson County Youth Court a petition to terminate the father's parental rights. The petition asserted that: (1) the child had been adjudicated an abused child, (2) the child had been in JCCPS's custody for at least six months, (3) the court had conducted a permanency hearing in which it determined that JCCPS had made reasonable efforts toward reunification with the father, but the father had failed to comply substantially with the service plan pursuant to Mississippi Code Section 93-15-115(c) (Rev. 2021), (4) termination of the father's parental rights was in the best interest of the child and (5) termination was appropriate "based on one or more of the grounds set out in Section 93-15-119 or 93-15-121." A guardian ad litem (GAL) was appointed on December 21, 2021.

¶10.    The termination-of-parental-rights (TPR) hearing was conducted over three days in 2022: December 1, December 20, and December 28. JCCPS called Dr. Scott Benton, Dominique Wooten, Florence Motes, and the child's foster father at the time to testify. Also, the GAL provided a narrative for the youth court and the record. Testifying on the father's

behalf was the father himself, the child's paternal grandmother and the child's babysitter.

¶11.    Dr. Benton, who was accepted as an expert in child abuse pediatrics, testified about the type of fracture the child had sustained. After reviewing the child's medical documents, Dr. Benton concluded that the child had sustained "a right transverse, both bone, meaning radius and ulna, fracture of the forearm," which also is known as a three-point bending fracture. He informed the court that this type of injury requires a force to be applied to the middle of the two bones and the elbow and wrist to be in a fixed position. Dr. Benton explained that this injury requires "a forward movement" and "a development ability to protect yourself, meaning to put your hand out."  He stated that there were multiple mechanisms that could have caused this injury, but "the two common mechanisms" were (1) "a fall onto an outstretched hand" and (2) "a direct blow to those two bones where a force is applied[.]" Dr. Benton asserted that there was no specific type of fracture that establishes or indicates that a child has been abused and that this type of injury was "one of the more common fractures that are seen generally . . . throughout all age ranges." But he explained that this type of injury should not happen to a child who has not yet learned to walk and that it was "highly unlikely" to occur to a child that was attempting to or learning to walk. While he could not be certain about how the injury had come about, he did not believe that the explanations given by the father would have caused this injury without some degree of excessive force. It was his opinion that the father had some involvement in causing the injury to the child's arm.

¶12. JCCPS worker Dominique Wooten testified that the reason the permanency plan was changed to adoption was because the child sustained a third injury that had occurred during her ninety-day trial placement with her father. She testified further that she did not believe the father had any type of "protective capacity" for the child. She stated that the child was one year old and was crawling and pulling up when she was hurt. According to Wooten, due to her age, the child should have been supervised at all times, and there should be no reason the father would not know what happened to the child.

¶13. The GAL testified that the father had been given a real opportunity for reunification but "when we have these continuous injuries, it's concerning . . . and at the end of the day there are three unexplained injuries and I would not feel comfortable sending this child back to dad."

¶14. JCCPS asserted that the father was the "common denominator" since he was present for each injury the child had sustained. Several witnesses testified about their concerns regarding the father's ability to raise and protect the child. JCCPS asserted that, regardless of whether or not he was the perpetrator, the father had failed to protect the child. According to several witnesses, the child needed medical and dental care after she was removed from the father's care and placed in the care of her foster parents. Various witnesses said that, at the time of the broken arm injury, the child was not walking; but they asserted that she could crawl and was capable of pulling herself up "like a normal baby would." Multiple witnesses testified that the father had complied and completed all of the requirements that were a part

of his service plan.

¶15. According to the father, the child's grandmother and the child's babysitter, the only indication or notice that V.I.C.'s arm was broken was that she would grimace or pull away when being dressed. Testimony was given that no marks or any visible injuries suggested that the child was suffering from a severe injury. Testimony also showed that the child continued to use the arm when playing or eating and that the child was not continuously crying out in pain. The father, grandmother and babysitter disputed the assertions made regarding the child's medical and dental condition upon being removed from the father's care.

¶16. The father said that he had not abused his child and that the child's mother had caused the first two injuries. When asked if he felt that his parental rights should be terminated, the father responded no, explaining that he loves his child and that she was "like a gift from God, and . . . [he] can't sit here and just watch [his child] go away." He repeatedly testified that he would "do whatever it takes for [the child] to come back to her family." Regarding his fitness to raise his child, the father asserted that he had never been diagnosed with any mental health issues and that he was "not that type of person that would harm a child."

¶17. After the child was removed from his care, the father attended regularly scheduled visitations with the child, and he, on occasion, would bring gifts and snacks for the child. But, in March 2022, visitation was discontinued after the father directed several threatening messages toward JCCPS and its employees. The father testified that the reason he had sent those threatening messages was that he was suffering from depression. He explained that,

9

although he had not been diagnosed by a medical professional, he felt depressed because he felt that he was being "railroaded" and was not being treated fairly. He explained also that he did not become depressed until the ordeal of terminating his parental rights. On the stand, the father accepted responsibility for his actions and acknowledged that he was wrong for making threats.

¶18. After JCCPS rested, the father moved for an involuntary dismissal. He argued for the first time that Section 93-15-115 was not satisfied because JCCPS had failed to prove that he had failed to substantially comply with his service plan. JCCPS disagreed, arguing that Section 93-15-119 controlled and was a stand-alone statute. JCCPS asserted that there was no "prerequisite of substantial compliance because there are cases of aggravated circumstances" and that it had shown by clear and convincing evidence that the child's safety and welfare were at risk due to the father's being mentally, morally or otherwise unfit. The youth court judge said that he did not "know enough about the rules of Youth Court to make [a] ruling . . . from the bench," asked the parties to provide briefs on the issue and continued the hearing to December 28, 2022.

¶19. Ultimately, the youth court judge denied the father's motion to dismiss, ruling that Section 93-15-119 was the correct statute, not Section 93-15-115. The court reasoned that the 2017 amendment to Section 93-15-119, which struck the term chancery court and replaced it with the term court, had given him authority to proceed and that he did "not feel as though [Section 93-15-119] require[d] all of the elements that are required under

10

93-15-115[.]"

¶20.   At the conclusion of the termination of parental rights hearing, the trial judge issued

his ruling from the bench, stating in relevant part:

> So we have three different incidents of what I consider to be fairly serious injuries to a child certainly of that age. And based on the time frame of that, the age of the child, the fact that the father was present on all three occasions, and in taking reasonable inferences into consideration, I find that under 93-15-119, the State has met their burden of proof by clear and convincing evidence, and showing that the conduct of the parent demonstrates a substantial risk of compromising or endangering the child's safety and welfare, and that termination of parental rights is appropriate.

This bench ruling was followed by a written order terminating the father's parental rights,

which was entered on January 3, 2023.[2]  X.G.C. timely appealed.  On appeal, X.G.C. asks

this Court to reverse the termination of his parental rights.

## ISSUES PRESENTED

¶21.   The issues raised by X.G.C. can best be summarized as:

I.      Whether the youth court failed to make specific findings as required by Section 93-15-115.

II.     Whether JCCPS met its burden under Section 93-15-119 to prove by clear and convincing evidence that X.G.C. was unfit to raise the child.

## STANDARD OF REVIEW

---

[2]The date on the document states that it was signed on January 3, 2022, but the filing date was January 3, 2023. We find that the year 2022 is a scrivener's error since the TPR hearing occurred and ended in December 2022. Thus, January 3, 2023, is the only logical date on which the order could have been signed.

¶22. "[T]he standard of review and statutory basis for termination of parental rights is quite limited." ***A.H. v. K.M. (In re Adoption of A.M.)***, 323 So. 3d 509, 513 (Miss. 2021) (alteration in original) (internal quotation marks omitted) (quoting ***Adoption of J.M.M. v. New Beginnings of Tupelo, Inc.***, 796 So. 2d 975, 978 (Miss. 2001)). We have held that "[t]his Court will not disturb the [judge's] opinion when [it is] supported by *substantial evidence* unless the [judge] abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." ***Samples v. Davis***, 904 So. 2d 1061, 1064 (Miss. 2004) (internal quotation marks omitted) (quoting ***Holloman v. Holloman***, 691 So. 2d 897, 898 (Miss. 1996)). Under the manifest error/substantial credible evidence test, "this Court asks. . . [']whether . . . credible proof' exists to support the judge's findings of fact 'by clear and convincing evidence.'" ***S.F. v. Lamar Cnty. Dep't of Child Prot. Servs. ex rel. Davenport***, 373 So. 3d 985, 987 (Miss. 2023) (quoting ***Ethredge v. Yawn***, 605 So. 2d 761, 764 (Miss. 1992)). While this Court "giv[es] deference to the [youth court's] findings of fact[,]" ***id.*** at 987 (internal quotation marks omitted) (quoting ***G.Q.A. v. Harrison Cnty. Dep't of Hum. Res.***, 771 So. 2d 331, 335 (Miss. 2000)), we have held that "where on review it is apparent the court below has misapprehended the controlling rules of law or has acted pursuant to a substantially erroneous view of the law, we will proceed de novo and promptly reverse." ***S.N.C. v. J.R.D., Jr.***, 755 So. 2d 1077, 1080 (Miss. 2000) (internal quotation marks omitted) (quoting ***Ethredge***, 605 So. 2d at 764). Also, "[q]uestions of law, such as statutory interpretation, are subject to a *de novo* standard of review." ***Tellus Operating Grp., LLC v.***

***Tex. Petroleum Inv. Co.***, 105 So. 3d 274, 278 (Miss. 2012) (citing ***Laurel Ford Lincoln-Mercury, Inc. v. Blakeney***, 81 So. 3d 1123, 1125 (Miss. 2012)).

**ANALYSIS**

**I.** **Whether the youth court failed to make specific findings as required by Section 93-15-115.**

¶23.    X.G.C. argues that the youth court erred by terminating his parental rights because the youth court never found that he had failed to substantially comply with his service plan pursuant to Section 93-15-115.  JCCPS claims that Section 93-15-119 "is a separate and distinct provision" and "applies to any termination of parental rights action on grounds that a parent is 'mentally, morally, or otherwise unfit to raise the child."  JCCPS claims that "[t]he plain language of Section 93-15-119 authorizes the Jackson County Youth Court to adjudicate the termination of Appellant's parental rights without making findings under Section 93-15-115."

¶24.    This case centers on the interplay of the statutes within the Mississippi Termination of Parental Rights Law (MTPRL), Mississippi Code Sections 93-15-101 to -133 (Rev. 2021).  Four relevant statutes pertain to the involuntary termination of parental rights under the MTPRL: Section 93-15-115, Mississippi Code Section 93-15-117 (Rev. 2021), Section 93-15-119 and Mississippi Code Section 93-15-121 (Rev. 2021).  This issue raised by X.G.C. asks this Court to accord Section 93-15-115 with Section 93-15-119.  Section 93-15-115 states:

> *When reasonable efforts for reunification are required* for a child who

13

is in the custody of, or under the supervision of, the Department of Child Protection Services pursuant to youth court proceedings, the court hearing a petition under this chapter may terminate the parental rights of a parent if, after conducting an evidentiary hearing, the court finds by clear and convincing evidence that:

(a)     The child has been adjudicated abused or neglected;

(b)     The child has been in the custody and care of, or under the supervision of, the Department of Child Protection Services for at least six (6) months, and, in that time period, the Department of Child Protection Services has developed a service plan for the reunification of the parent and the child;

(c)     A permanency hearing, or a permanency review hearing, has been conducted pursuant to the Uniform Rules of Youth Court Practice and the court has found that the Department of Child Protection Services, or a licensed child caring agency under its supervision, has made reasonable efforts over a reasonable period to diligently assist the parent in complying with the service plan but the parent has failed to substantially comply with the terms and conditions of the plan and that reunification with the abusive or neglectful parent is not in the best interests of the child; and

(d)     Termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome based on one or more of the grounds set out in Section 93-15-119 or 93-15-121.

Miss Code Ann. § 93-15-115 (Rev. 2021) (emphasis added).

¶25.   Section 93-15-119(1) states in relevant part:

(1)     A court hearing a petition under this chapter may terminate the parental rights of a parent when, after conducting an evidentiary hearing, the court finds by clear and convincing evidence:

(a)(I) That the parent has engaged in conduct constituting abandonment or desertion of the child, as defined in Section 93-15-103, or is mentally, morally, or otherwise unfit to raise the

14

child, which shall be established by showing past or present conduct of the parent that demonstrates a substantial risk of compromising or endangering the child's safety and welfare; and

(ii)     That termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome; or

(b)     That a parent has committed against the other parent a sexual act that is unlawful under Section 97-3-65 or 97-3-95, or under a similar law of another state, territory, possession or Native American tribe where the offense occurred, and that the child was conceived as a result of the unlawful sexual act. A criminal conviction of the unlawful sexual act is not required to terminate the offending parent's parental rights under this paragraph (b).

Miss. Code Ann. § 93-15-119(1) (Rev. 2021).

¶26.    Comparing the plain language of Section 93-15-115 and Section 93-15-119, it is clear that Section 93-15-115 acts as a prerequisite when the case originates in youth court proceedings concerning an adjudicated abused child that is in the care, custody or supervision of child protection services and when reasonable efforts for reunification with the parent(s) are required.  If reasonable efforts are required and the Section 93-15-115 statutory elements are not met, then termination is off the table. If the parent does not comply, as is the case here, then, according to Section 93-15-115(d), termination comes back into play under either Section 93-15-119 or Section 93-15-121.[3]

¶27.    The parties spend considerable effort arguing whether "aggravated circumstances"

---

[3]This Court will only discuss Section 19-15-119 because it has been argued by the parties and was relied on by the court for termination of X.G.C.'s parental rights.

15

pursuant to Mississippi Code Section 43-21-603(7) (Rev. 2023) were found by the youth court, which allegedly would impact which statute (Section 93-15-115 or 93-15-117) controls this case. They are both wrong.

¶28. Section 93-15-117 is inapplicable. Section 93-15-117 provides for termination of parental rights "[w]hen reasonable efforts for reunification are not required[.]" That is not, however, the case before us. This was always a reunification case and, therefore, Section 93-15-115 would apply, not Section 93-15-117.

¶29. The statutory requirements of Section 93-15-115 control in a reunification case. Changing the permanency plan in the middle of the proceedings from reunification to termination does not affect the applicability of Section 93-15-115, but, rather, it is specifically provided for in Section 93-15-115. The argument that Section 93-15-117 would apply in this situation would render Section 93-15-115 meaningless. *See Rush v. Rush Health Sys. Inc.*, 359 So. 3d 1047, 1061 (Miss. 2023) ("A construction which will render any part of a statute inoperative, superfluous or meaningless is to be avoided." (internal quotation marks omitted) (quoting *Moore v. State*, 287 So. 3d 905, 918 (Miss. 2019))). The court's use of the term "aggravated circumstances" in this scenario did not change which statute controlled. Whether Section 93-15-115 or Section 93-15-117 applies is a determination that correlates to the court's initial determination of whether reasonable efforts at reunification were required. Section 93-15-117 applies when the court bypasses the requirements for reasonable efforts at reunification. *See* § 43-21-603(7). Section 93-15-115 should be used

16

in this exact scenario as provided by the statute—when the youth court decides to transition from reunification with the parent to termination of parental rights.

¶30. After the court granted JCCPS's request to change the permanency plan to termination of parental rights, JCCPS filed a petition for termination, claiming Section 93-15-115 was satisfied. Specifically, it argued that the child was adjudicated abused in September 2020 by order of the youth court. *See* § 93-15-115(a). The child had been in the custody and care of JCCPS for a period of at least six months, and JCCPS had developed a service plan for the reunification of the child with the father. *See* § 93-15-115(b). JCCPS's petition noted that the youth court had conducted a permanency hearing in which it found that JCCPS had made reasonable efforts over a reasonable period of time to diligently assist the father in reunification efforts and compliance with the service plan but that X.G.C. had failed to substantially comply; therefore, the court found that reunification was no longer in the child's best interest. *See* § 93-15-115(c). JCCPS argued that termination was appropriate because reunification was not desirable based on one or more of the grounds stated in Section 93-15-119 or Section 93-15-121. *See* § 93-15-115(d). JCCPS then set out its reasons under Section 93-15-119 and Section 93-15-121 for termination of parental rights.

¶31. We further reject X.G.C.'s argument that the youth court failed to satisfy the requirements of Section 93-15-115. The record supports, however, that the youth court found that X.G.C. had "failed to substantially comply with the terms and conditions of the plan and that reunification with the abusive or neglectful parent is not in the best interests of

17

the child[.]" § 93-15-115(c).

¶32. X.G.C. had a ninety-day trial period during which he was to prove that he could provide a safe, stable, drug-and-violence-free home for the child. The removal of the child from the home due to a serious unexplained injury is sufficient to show that X.G.C. failed to substantially comply with the service plan. Ideally, the youth court would have specifically articulated that the broken arm injury is substantial noncompliance, but under these facts and the context of the discussion at the February 8 hearing, it is clear that the court found that Section 93-15-115(c) was satisfied.

¶33. X.G.C. demonstrated an inability to provide a safe home for his child, which violated the terms of the service plan. We will not reverse the youth court's decision when the record supports the youth court's finding that reunification was no longer in the best interest of the child. The best interest of the child is paramount, and we will not let form trump substance.

**II. Whether JCCPS met its burden under Section 93-15-119 to prove by clear and convincing evidence that X.G.C. was unfit to raise the child.**

¶34. Here, the statutory requirements of Section 93-15-115 were met, so the termination process began under Section 93-15-119. This Court has already noted the abundance of evidence that was presented at the three-day trial in December 2023. After the trial, the judge stated:

> [When] you have cases like this that involve children that are too young to speak and can't tell you what happened, you have to look at all the surrounding circumstances. You have to look at a timeline; you have to look and see who had access to the child, when they had access to the child; how

18

many times a child gets brought in and things along that-of that nature.

. . . .

So we have three different incidents of what I consider to be fairly serious injuries to a child certainly of that age. And based on the time frame of that, the age of the child, the fact that the father was present on all three occasions, and in taking reasonable inferences into consideration, I find that under 93-15-119, the State has met their burden of proof by clear and convincing evidence, and showing that the conduct of the parent demonstrates a substantial risk of compromising or endangering the child's safety and welfare, and that termination of parental rights is appropriate.

¶35. The court relied on the presented testimony, the GAL's recommendation and the documentation in evidence to support its finding that Section 93-15-119 was satisfied. The court's ruling is supported by substantial and credible evidence. This Court will not "disturb the [judge's] opinion when supported by *substantial evidence* unless the [judge] abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Samples*, 904 So. 2d at 1064 (internal quotation mark omitted) (quoting *Holloman*, 691 So. 2d at 898). As such, we find no error.

## CONCLUSION

¶36. We find no error in the court's decision to terminate X.G.C.'s parental rights. Further, we find that the record supports that all statutory requirements for termination were satisfied. Accordingly, we affirm.

¶37. **AFFIRMED.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., MAXWELL, ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**

19